## SABATINI v. COMMISSIONER OF INTERNAL REVENUE.

## COMMISSIONER OF INTERNAL REVENUE v. SABATINI.

### No. 288.

Circuit Court of Appeals, Second Circuit.

Aug. 4, 1938.

## ATLANTIC TRANSPORT COMPANY, Appellant, v. Harry M. DURNING, Collector of Customs, Port of New York, Appellee.

### No. 382.

Circuit Court of Appeals, Second Circuit.

Aug. 1, 1938.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

James W. Morris, Asst. Atty. Gen., and Sewall Key, A. F. Prescott, and Alexander Tucker, Sp. Assts. to Atty. Gen., for the Commissioner.

Edgar J. Goodrich, of Washington, D. C., William De Forest Manice, of New York City, and Eugene Meacham, of Washington, D. C. (Guggenheimer & Untermyer, of New York City, of counsel), for Rafael Sabatini.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The taxpayer is an alien; a subject of Great Britain residing in London, England. He is an author who during the years in question was represented in this country by a firm of authors' representatives and part of the time by a New York bank but all in respect to matters other than the tax liabilities here involved. He, neither before nor during the years for which deficiencies in his taxes have been redetermined, was personally in this country. Some income was received for him by his representatives here and reported for taxation but we are not now concerned with that except as the taxpayer urges the fact as evidence of his lack of knowledge that he was bound to file income tax returns for the years in question. He did not do that and none were filed in his behalf within the time allowed for their filing.

The taxpayer has written numerous books. The income received by him and claimed taxable by the Commissioner arose from certain contracts for the publication or dramatization of his works together with his authorization of their use in motion pictures.

Under Sec. 119 of the Revenue Law of 1928, 26 U.S.C.A. § 119, gross income to be treated as income from sources within this country is defined and under Sec. 212 of the same Act, 26 U.S.C.A. § 211, it is provided that in the case of a non-resident alien individual gross income includes only income from sources within the United States. As income of the last mentioned kind may here be taxed to this individual, the sole question at issue is whether any part of the income he received during the taxable periods mentioned came from sources within this country within the statutory meaning of that language. The income sought to be taxed was all received by him in payment for granting rights to publish or produce one or more of his literary productions. There are what amount to three classes of income, viz., that received under contracts (1) covering volume and second serial rights; (2) motion picture rights; and (3) dramatic rights.

Volume and Second Serial Rights.

Mr. Sabatini entered into a number of contracts with Houghton Mifflin Company, publishers in Boston, Mass., under which he granted to that company the volume and second serial rights in certain books he had written. These books were themselves of what should now be treated as two kinds. They were (1) those on which a United States copyright could be obtained and the right to apply for one either in its own name or that of the author was given the company with the agreement of Sabatini to co-operate to obtain permissible renewals for the benefit of the publishers; and (2) those under which it was stated in the contracts that no copyrights were obtainable. We take this to mean that the works in the latter

class were already in the public domain. As to the first class, the exclusive right to publish in this country during the copyright term and any renewals thereof was granted. As to the second class the author agreed not to grant to anyone else in this country the right to publish the work here "so long as said Houghton Mifflin Company shall keep in print their editions of the above-named books".

In each instance the contracts were negotiated by the author's literary representatives in this country but only subject to the final approval of the author who did approve and execute all of them in London, England. In each instance the author was to be paid a stated percentage of the publisher's retail trade list price, or an otherwise stated amount, for each volume sold. All the payments were to be made to the author's representatives here for his benefit.

In so far as these works were copyrightable the payments received fall within the author's gross income from sources within the United States under Sec. 119 (a) (4), 26 U.S.C.A. § 119 (a) (4) providing that such income includes: "Rentals or royalties from property located in the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using in the United States, patents, copyrights, secret processes and formulas, good will, trademarks, trade brands, franchises, and other like property."

They were clearly in name and in fact royalties for the use of United States copyrights during their terms and renewals. Though we are not fully advised as to what copyrights were actually secured, in so far as any which might have been obtained were not, the receipts by the author nevertheless fall within the statute as rentals or royalties for the use of or the privilege of using other like property. In this last named category fall also the payments received by the author from his contracts covering the publication of his uncopyrightable works. The payments were received in consideration of his granting the publisher the exclusive right to publish here. To be sure, that may not have been of great value but the parties did value it and the author received the payments as agreed. We are not now concerned with the quality of the consideration he gave but only with the taxability of that which he received. The payments were made to him for foregoing his right to authorize others for a time to publish the works here. Though others may, perhaps, lawfully have published them they could not do so under his express authority. As in respect to the copyrightable works, he received royalties for granting the exclusive right to publish with his express permission. The rights he granted were an interest in property in the United States, in the one instance the statutory copyrights obtainable and in the other the exclusive right to publish with his permission. The order of the Board is affirmed as to the taxability of this income.

### The Motion Picture Rights.

The author granted the exclusive world-wide right to produce motion pictures based on five of his works for a stated period. As the contract was made in England, the Board treated it as a sale of property there and held the income derived from the sale not taxable. See Compania General v. Collector, 279 U.S. 306, 49 S.Ct. 304, 73 L. Ed. 704. We cannot agree that what occurred was a sale. It was instead but a granting of the right to produce motion pictures from the works for a limited time. The author remained the owner of his works and merely licensed their use for a particular object for a period. There was no transfer of title necessary to a completed sale. Whitfield v. United States, 92 U.S. 165, 23 L.Ed. 705.

The fact that one lump sum was received for the privilege of using the property of the author instead of a series of payments does not alter the real character of what the taxpayer received. It was payment for the use of his literary property for the purpose named and in so far as it was in payment for use in the United States was taxable as a royalty paid in advance and received for the granting of that privilege. While there seems to be no direct authority for this view of the meaning of the statute, we believe it correct in principle and the order of the Board in this respect is reversed.

The dispute as to income from the sale of dramatic rights relates only to royalties received from the licensing for dramatization of the copyrighted work entitled "Scaramouche". Advance royalty was received in a lump sum together with additional royalties accruing from time to time. The Board held this income taxable and we agree that it was. As the taxpayer no long-

er questions that, no more need be said about it.

■■ It is also contended that Mr. Sabatini was innocently mistaken as to the necessity for filing tax returns and no penalties should have been imposed. There is, indeed, no reason to believe that he intended any tax evasion whatever. The government argues that the imposition of the penalties was mandatory but that is only where no returns are filed at all. Edmonds v. Commissioner, 9 Cir., 90 F.2d 14, 18. Here returns were filed late after the controversy arose and the imposition of penalties depends upon whether the failure to file on time was due to reasonable cause or to willful neglect. The burden to excuse the failure was on the taxpayer and the Board has found that no reasonable cause for the failure to file returns was shown. The taxpayer may well have believed that he was liable for no taxes and yet have had no reasonable cause for not filing timely returns. At any rate there is no basis in this record sufficient to warrant a reversal of the Board on this point.

■ One other issue of a most unusual nature remains. The taxpayer employed a tax expert in this country to represent him after his controversy with the government arose. This man apparently forged a letter addressed to the taxpayer in care of the expert to the effect that after careful consideration had been given the matter in the office of the Commissioner it had been held that no deficiency existed. On the strength of that, he collected his fee from Mr. Sabatini. Later the expert employed a reputable attorney in Washington to represent Mr. Sabatini before the Board of Tax Appeals. This attorney did so without knowledge of the expert's fraudulent conduct and supposed Mr. Sabatini was duly informed and would be present. Misled by the expert as to the facts and hampered by the absence of Mr. Sabatini who had not been informed of the hearing, the attorney conceded liability for taxes assessed on income received from contracts involving what are called first serial rights in respect to certain works. The decision on this point followed the concession and we are now asked to correct the decision or remand to the Board that it may have an opportunity to do so as the fraud of the tax expert was not discovered until after it made its decision. As this matter was not raised before the Board and the record here is insufficient to inform us

as to the facts, we cannot now review the decision sustaining the tax. General Utilities & Operating Co. v. Helvering, 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154; Helvering v. Pfeiffer, 302 U.S. 247, 58 S.Ct. 159, 82 L.Ed. 231. But the concession was seemingly part of the result of the fraud and the Board should have the opportunity to decide whether the taxpayer was deprived of any lawful rights because of it. It may be that the concession was harmless for the reason that the income was taxable but, as we cannot now decide that, the cause is remanded to the Board of Tax Appeals in order that the taxpayer, if so advised, may there apply for relief on this point.

Decision modified in accordance with this opinion and cause remanded to the Board of Tax Appeals.