**ROHMER et ux. v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 87.**

Circuit Court of Appeals, Second Circuit.

Jan. 3, 1946.

Perkins, Malone & Washburn, of New York City (Watson Washburn and Royal E. Mygatt, both of New York City, of counsel), for petitioners.

Samuel O. Clark, Jr., of Washington, D. C. (Sewall Key, Helen R. Carloss, and Melva M. Graney, all of Washingٍton, D. C., of counsel), for respondent.

J. Robert Rubin, of New York City (Samuel D. Cohen, David O. Decker, and Eliot Rosenthal, all of New York City, of counsel), for Loew's Inc., amicus curiæ.

R. W. Perkins, of New York .City (Joseph D. Karp, of New York City, of counsel), for Warner Bros. Pictures, Inc., amicus curiæ.

Before SWAN, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. Section 211(a) (1) (A)[1] expressly includes "interest" and "rents" but not royalties. Yet the following legislative history shows, we think, that Congress intended to include royalties. From 1918 to 1934, inclusive, the Revenue Acts successively contained a provision—substantially like the present § 143(b), 26 U.S.C.A.Int.Rev.Code,—for a withholding tax on all "rent, salaries, wages, premiums, annuities, compensations, remunerations, * * * or other fixed or determinable annual or periodical gains, profits, and income" of a nonresident alien. Royalties were not mentioned. The provisions as to the extent of such an alien's liability for tax, however, explicitly included gross income derived, inter alia, from sales of personal property within the United States[2] and from "rents or royalties from property located in the United States or from any interest in such property, including rentals or royalties for the use of or the privilege of using in the United States, patents, copyrights, secret processes and formulas, good will, trade-marks, trade brands, franchises, and other like property." 26 U.S.C.A.Int.Rev.Code, § 119(a) (4), (e). Despite the differences in these provisions, the Treasury Regulations, under the successive Acts from 1924 to 1934, inclusive, provided that the withholding provisions excluded income derived from the sale of property but included "royalties." By amendment of the Act in 1936, the provision as to liability for tax was restricted, as we find it now in § 211(a) (1) (A), so that its coverage became the same as that of the withholding provision. Congress, we think, must have intended the liability for tax provision, thus amended, to be interpreted as the Treasury Regulation had previously interpreted the withholding provision, i. e., to include royalties.[3] And the Regulation interpreting § 211(a) (1) (A) so provides.[4]

The taxpayers, however, contend that § 211(a) (1) (A) is inapplicable here

---

[1] It reads: "There shall be levied, collected, and paid for each taxable year, in lieu of the tax imposed by sections 11 and 12, upon the amount received, by every nonresident alien individual not engaged in trade or business within the United States and not having an office or place of business therein, from sources within the United States as interest (except interest on deposits with persons carrying on the banking business), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income, a tax of 15 per centum of such amount * * *." Int.Rev.Code, § 211(a) (1) (A), as amended by Revenue Act 1940, § 4, 26 U.S.C.A. Int.Rev.Code, § 211(a) (1) (A).

[2] With qualifications not here important.

[3] The Committee Reports stated that the tax under the amended statute "is collected at the source by withholding as provided for in § 143."

[4] See Regulations 103, § 119.211-7(a). The Regulations in interpreting the withholding section, § 143(b), provide the same; see Regulations 103, § 119.-143-2.

because the transferee here (1) paid a lump sum for (2) the acquisition in toto of a specific part (although less than all) of the author's "bundle of rights" under his copyright; such a payment, say taxpayers, is not a payment of "royalties" but of the purchase price on a sale of personal property.[5] We cannot agree. We think that this, at least, is true: Where a copyright owner transfers to any particular transferee substantially less than the entire "bundle of rights" conferred by the copyright, then payment therefor, whether in one sum or in several payments, constitutes royalties within the meaning of § 211(a) (1) (A). For such a transfer is the grant of a license.[6] Payment for the grant of such a license is measured by reference to the future use or expected use of the license by the licensee, and is often payable in installments; but it is no less a royalty paid for such use when disbursed in a single amount.[7] We think that Congress therefore meant to include such payments within the phrase "other fixed or determinable * * * periodical gains, profits, and income" even if, in some particular instance, or by a practice which has grown up as to some types of such licenses, payment is made in a single sum. It is like interest paid for several years in one sum or rent paid in advance for the use of a building for a period of years; as such a payment of interest or rent surely would come within the subsection,[8] so, we hold, does the payment here.[9] The phrase, we hold, is descriptive of the nature or type of income, regardless of the actual manner of payment.

In Sabatini v. Commissioner, 2 Cir., 98 F.2d 753, we held that income, consisting of a lump sum payment, under a contract made in England for the transfer by a nonresident alien of the world-wide right to produce motion pictures for a limited period, was not derived from a sale of property in England but was taxable as royalties, paid in advance, for the use in the United States. The withholding provision was not involved. The tax on aliens at that time included a tax on the proceeds of a sale of personal property, but not if the property was produced without and sold without the United States; however, the tax, as noted above, also included a tax on "royalties for the use of or for the privilege of using in the United States * * * copyrights, * * * and other like property."[10] In the Sabatini case, we assumed that, because the contract was made in England, if the transaction was a "sale," it was not taxable; holding that it was not a sale, we held that the proceeds were taxable as royalties. True, there the transfer was but for a limited time, while here the time is unlimited; that we think is a distinction without a difference, since here, as in Sabatini, the transfer was but of a limited part of the author's bundle of rights, for Rohmer transferred only his serial rights, reserving, inter alia, the book rights, motion picture rights and most of the dramatic rights.

It is also true that the section as to the extent of tax liability before us in the Sabatini case did not contain the phrase, found in § 211(a) (1) (A), "or other fixed or determinable annual or periodical gains, profits, and income." It is therefore argued that, even if royalties are covered by § 211(a) (1) (A), they must be royalties which have the feature of being paid as "annual or periodical" income. In rejecting that argument we rely, again, on the legislative history: The 1936 amendment excluded the proceeds of sales, theretofore taxed, from the taxable in-

---

[5] Cf. Miller, Taxation of Income from Literary Property Owned by Nonresident Aliens, 54 Yale L.J. (1945) 879, 884.

[6] Goldwyn Pictures Corp. v. Howells Sales Co., 2 Cir., 282 F. 9; New Fiction Pub. Co. v. Star Co., D.C., 220 F. 994.

[7] Cf. Hazeltine Corp. v. Zenith Radio Corp., 7 Cir., 100 F.2d 10, 16, 17.

[8] Cf. Commissioner v. Raphael, 9 Cir., 133 F.2d 442.

[9] The "property" of the owner of a copyright (like that of a patentee), because of his "monopoly" power, is sometimes thought to be utterly different from other kinds of property. But his "monopoly" power is not markedly distinct from that of owners of other sorts of "property." For it is of the essence of "property," generally, that its owner has the right, enforceable by court action, to exclude others from its use, absent his consent; and that power to exclude is what "monopoly" ordinarily means. See Standard Brands, Inc. v. Smidler, 2 Cir., 151 F.2d 34, 38, 39, note 7. Payment in advance for the use of land is therefore not essentially different from payment in advance for the use of a copyright.

[10] See 1928 Act, §§ 119 and 211–217, 26 U.S.C.A. Int.Rev.Acts, pages 391, 416–418.

comes of nonresident aliens engaged in trade or business in this country and not having office or place of business here. At the time of enacting that amendment, the Congressional Committee Reports stated that the purpose was to tax "gross income from interest, dividends, rents, wages, and salaries and other fixed and determinable income," but said that, by the amendment, "the tax on capital gains" of such aliens was to be excluded, *"it having been found impossible to effectively collect this latter tax * * *"*[11] The Reports also said, "It is believed that the proposed revision of our system of taxing non-resident aliens * * * will be *productive of substantial amounts of additional revenue, since it replaces a theoretical system impractical of administration in a great number of cases."*[12] We think that these Reports show that Congress intended the words "other fixed or determinable annual or periodical gains, profits and income" to be interpreted to mean "other fixed and determinable income," and to include therein a lump sum paid for the use of a copyright in the United States. Such a payment for a license is both "fixed" and easily "determinable," and it is not at all "impossible to effectively collect" a tax thereon. Accordingly, we think that Congress did not intend to exclude such a tax; for Congress avowedly sought "substantial amounts * * * of revenue" from taxation of nonresident aliens and aimed primarily to replace "a theoretical system impractical of administration."[13] In thus stressing the legislative history, we are following many recent decisions of the Supreme Court.[14] We confess that the Congressional purpose is not crystal-clear and that the legislative history does not put beyond all conceivable doubt the purpose to impose a tax on such transactions as that before us here. But, after careful study, we believe we have arrived at the correct interpretation.

It is argued, however, that General Aniline & Film Corp. v. Commissioner, 2 Cir., 139 F.2d 759, which involved the withholding provision, § 143(b), compels reversal here. But there we held that the transfer was such that the transferee probably acquired title to the patents; at any rate, we considered that virtually all the patentee's rights passed to the transferee, so that there was a sale. It was that fact, and not the fact that (as to one of the contracts) a lump sum payment was made, which led to our conclusion that a sale had occurred and therefore no withholding was required. Cf. Commissioner v. Celanese Corporation, 78 U.S.App.D.C. 292, 140 F.2d 339. To be sure, in the General Aniline case [139 F.2d 760], we said that it was unimportant that the patentee, before making the assignment, "had granted to others some rights" under the patents; but, as the record shows that the extent of those previous grants was not disclosed to us, we must be taken as having regarded them as relatively insubstantial;[15] consequently, as we regarded the case, the patentee had transferred to a single grantee substantially all the rights it had originally acquired as patentee under the patents.[16]

█ In Goldsmith v. Commissioner, 2 Cir., 143 F.2d 466, a resident citizen of

---

11 Emphasis added.

12 Emphasis added.

13 Cf. Angell, Taxation of the Non-Resident Alien, 36 Col.L.Rev. (1936) 908.

14 See e. g., United States v. American Trucking Associations, 310 U.S. 534, 542-544, 60 S.Ct. 1059, 84 L.Ed. 1345; United States v. Dickerson, 310 U.S. 554, 562, 60 S.Ct. 1034, 84 L.Ed. 1356; Apex Hosiery Co. v. Leader, 310 U.S. 469, 489, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Markham v. Cabell, 66 S.Ct. 193; cf. Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194; Van Beeck v. Sabine Towing Co., 300 U.S. 342, 351, 57 S.Ct. 452, 81 L.Ed. 685; United States v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788; Keifer & Keifer v. R. F. C., 306 U.S. 381, 391, note 4, 59 S.Ct. 516, 83 L.Ed. 784.

15 What is "substantial" is a matter for case to case determination.

16 The legislative history was not called to our attention before we decided the General Aniline case.

There, under some of the contracts, down payments were made which could never be recovered by the transferee, but further payments were contingent upon future profits derived from the use of the patents. We think that our decision that the down payments were not royalties and were therefore outside the withholding provision would have been unquestionably correct, had it plainly appeared that they bore no relation to expected future profits from the patents' use. Since perhaps that fact in that case was not entirely clear, it is well to warn the bar that our decision that the down payments under those contracts were not within the statute should not be deemed an unshakable precedent. It is to be noted that we said that "the passing of

the United States transferred the exclusive motion picture rights in a copyrighted play to an American corporation receiving annual payments therefor, which he treated in his income tax return as capital gains realized from the sale of capital assets and consequently taxable at capital gain rates. This court held unanimously that the payments were taxable not as capital gains under § 117 of the 1938 Act, 26 U.S.C.A.Int.Rev.Acts, page 1061, but as ordinary income. But the members of the court differed as to the basis of the decision. Judge Chase said the grant of exclusive rights was not the "sale" of capital assets but the grant of an exclusive license, with the consequence that the payments were royalties. Judges Learned Hand and Swan said that it was immaterial whether "title" passed and that the grant of an exclusive license was a "sale" but not of "capital assets" as defined in § 117(a) (1), because the licenses were "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." As the legal result was the same in that case, whichever of the two rationales was accepted, the choice of rationale could there have no practical effect. And, because of the differing histories and purposes of § 117 and § 211(a) (1) (A), respectively, we think that the views expressed by the majority in the Goldsmith case have no bearing here. It is well to remember that the concepts employed in construing one section of a statute are not necessarily pertinent when construing another with a distinguishable background.[17]

██ 2. The publishing company acquired for $10,000 both the American and Canadian serial rights. If the taxpayers had shown that more was paid than would have been if the Canadian rights had not been acquired, then, to that extent, there would have been no tax since the additional amount paid would not have been a royalty for the use of the copyright in this country.[18] But taxpayers, who had the burden, offered no direct proof on that subject. An obvious and easy source of such proof, had the facts been as taxpayers contended, would have been the testimony of one of the editors of Liberty Magazine, but none of those editors was called as a witness. Instead, the taxpayers offered proof that the United States circulation of the magazine was 2,302,296 and the Canadian, 190,622, and testimony to the effect that from $1,000 to $1,500 each had been paid by some magazines for Canadian serial rights to the works of other lesser authors. The Tax Court decided that this evidence did not "furnish a sufficient basis upon which" it could "determine that any of the income was derived from sources outside the United States." Although, if we were called upon to decide that question of fact, we might regard the evidence as sufficient, we cannot say that the Tax Court unreasonably refused to do so.[19] For, at best, such evidence would lead to conjectural inferences.[20]

██ 3. The amount retained by the agent represented his commission, a part of Rohmer's expense. Since the tax is on the gross income from United States sources, such an expense item could not properly be deducted.

Affirmed.

---

title does not preclude the existence of royalties." Commissioner v. Hopkinson, 2 Cir., 126 F.2d 406, did not involve the portions of the Act imposing a tax on aliens.

[17] Cf. United Shipyards v. Hoey, 2 Cir., 131 F.2d 525, 526, 527.

[18] That point, not having been pressed by the taxpayer, was not noted in the Sabatini case.

[19] Cf. Boehm v. Commissioner, 66 S.Ct. 120; Commissioner v. Scottish American Co., 323 U.S. 119, 65 S.Ct. 169.

[20] Thus advertisers might pay little more, and perhaps nothing more, for the small Canadian circulation; they might believe that publicity directed to 190,622 Canadians had nothing remotely like the value of similar publicity directed to the same number of dwellers in this country. Amounts paid to authors for Canadian serial rights to certain stories might throw a very dim light on the value to a magazine of the Canadian serial rights to Rohmer's story.