OPINION. HarRON, Judge: The question to be decided is whether a lump-sum payment of $805,000 received by petitioner on December 4, 1942, is taxable in its entirety as ordinary income. Various agreements are involved and at first the series of transactions appear to make the facts complicated. The ultimate question deals with the taxability of what petitioner received and we need not be diverted by the elaborate design set before us. We think it is necessary to keep in mind the nature of the original transaction because the culmination of the series of transactions in petitioner’s receipt of a lump-sum payment of $805,000, in our opinion, reflects the nature of the first step. Lasky acquired from York exclusive motion picture rights in the life story of the individual, Sergeant York, for which Lasky paid $25,000 and agreed to pay a percentage of the gross rentals of the motion picture based on that story. There can be no doubt that Lasky acquired a license to produce a film story, a motion picture, and that what York was to receive constituted royalties. Sabatini v. Commissioner, 98 F. 2d 753, 755; Goldsmith v. Commissioner, 143 F. 2d 466, certiorari denied 323 U. S. 774; Rohmer v. Commissioner, 153 F. 2d 61, certiorari denied 328 U. S. 862; Commissioner v. Wodehouse, 337 U. S. 369. We do not need to run this point back to analyze whether what York held was a copyright, or what York’s interest in published books was. And since taxation is a practical matter, we need not be concerned about niceties in the definition of the word “royalty.” Commissioner v. Affiliated Enterprises, Inc., 123 F. 2d 665. It was provided in the agreement with York that all rights thereunder could be assigned, and Lasky assigned the rights and obligations under the agreement to Warner Bros. There were at least two agreements of Lasky with Warner Bros., since one of the agreements of May 15, 1940, was called a “Supplemental Agreement”; or there were three agreements. But, at this point, we need not become involved. Suffice it to say that we think all of the agreements with Warner Bros, made up one transaction between Lasky and Warner Bros. Substance rather than form is controlling. United States v. Phellis, 257 U. S. 156. Warner Bros. received only the rights to produce a motion picture based on the York story which Lasky had acquired from York. That which Warner Bros, agreed to pay Lasky for his rights, namely, a percentage of the gross film rentals of the motion picture, were no doubt “royalties” to Lasky. Sabatini, supra; Goldsmith, supra; Rohmer, supra. It is immaterial that Warner Bros, also had to pay “royalties” to York. The arrangement simply was one under which Warner Bros, was obligated to pay distinct royalties to two successive assignors of rights which were only a license. This result followed from Lasky’s assignment of the York contract. But if the above oversimplifies the arrangement, then it can be said, in the alternative, that Lasky’s power to share in the proceeds of the motion picture was due to his contribution as a producer. What we said in Herman Shumlin, 16 T. C. 407, is appropriate here: And the facts that a part of the proceeds originally took, the form of a share in royalties for a license to employ the material in a motion picture, see Commissioner v. Strauss (CCA.-2), 168 Fed. (2d) 441, and that eventually petitioner received a lump sum in substitution, fail to deprive the whole transaction of that basic character. Shuster v. Helvering, supra. We think there can be no doubt that Lasky’s share in the gross rentals of the York motion picture originally constituted ordinary income, taxable in its entirety to Lasky. He so regarded all of his payments, $196,216.80, which he accepted in 1941 and which he reported in his return for 1941 as ordinary income. This brings us to the lump-sum payment of $805,000 in December 1942. Warner Bros, credited to Lasky during 1942 in its account with him on its books, periodically, amounts which it recognized as his share of gross rentals under its agreement with Lasky. By the end of November 1942, the credits amounted to the total sum of $822,857.56. Lasky, for reasons which are rather vague in the record before us, elected not to take the shares which accrued periodically and were tendered to him until it became clear that the credits alone would suffice because Lasky preferred having the accruals of his shares accumulate in the hands of Warner Bros. It is difficult to know, or to find as a fact, that a bona fide dispute existed in 1942 between Lasky and Warner Bros. At the most, the record before us contains only the suggestion that Lasky and his advisors were suspicious about the possible existence of grounds for challenging the propriety of Warner Bros.’ computations of the dollar amounts of Lasky’s shares, its accounting practice and procedure, and its handling of the release of the film. For example, there is no testimony of any executive of Warner Bros, about any dispute or about the receipt by Warner Bros, of allegations of Lasky. And the testimony of Lasky does not establish that suspicions crystallized during 1942 to issues in a real dispute. The inference is plain, and we conclude, that by the end of 1942, Lasky reached a decision to step out of his contract with Warner Bros, and to terminate the contract. For example, in the document he executed with United Artists on December 4, 1942, Lasky authorized United Artists to execute any document to release and discharge Warner Bros, from paying any money to Lasky. United Artists in the document it executed with Warner Bros, on December 22, 1942, released and discharged Warner Bros. Warner Bros, closed its account with Lasky and paid $820,000 in cash to United Artists, out of which amount United Artists was repaid the $805,000 which it had paid a few days previously to Lasky. The credit balance under the Lasky-Warner Bros, agreement, $822,857.56, was closed on about December 22, 1942, by payment of $820,000 by Warner Bros., and $2,857.56 was charged to Lasky to take care of some undisclosed charge or adjustment. This ended and closed the Lasky-Wamer Bros, contract. The decision of the ultimate question requires that we construe the facts relating to the termination of the Lasky-Warner Bros, agreement. The petitioner does not concede that the issue should be posed in this way, but the realities of the matter compel us to see the situation as above described. We can conclude, only, from the steps taken that United Artists was a mere intermediary. There is no showing of any business purpose to Lasky in Lasky’s arrangement with United Artists. In fact, the record is meager and sparse in providing any explanation for the few days’ advance of funds to Lasky, which United Artists so quickly recouped out of Lasky’s account with Warner Bros, through Warner Bros.’ payment of $820,000. United Artists gained $15,000 for about 20 days’ use of its $805,000 which it advanced to Lasky, and that was the only “business” aspect of the arrangement as far as United Artists was concerned. There is ample authority for looking through the form to the substance of the three-way arrangement in which United Artists played a brief role. Gregory v. Helvering, 293 U. S. 465; MacQueen Co. v. Commissioner, 67 F. 2d 857; Canister Co., 30 B. T. A. 895, affd. 78 F. 2d 1013. When the steps taken are seen in the above light, there was no more than an ending of the Warner Bros.-Lasky agreement, and Lasky received the accumulated “royalties,” or shares, due him, the receipt of which had been held up. The petitioner cannot succeed in this case by arguing that the contract or the contracts were “property”; and that “sales” were made of contracts. Cf. Shuster v. Helvering, 121 F. 2d 643; Herman Shumlin, supra. Petitioner was entitled to receive payment of agreed shares of the gross film rentals of the York picture, and by the end of 1942, his shares had accrued and had been credited to him. This is not even a case where indeterminate or future payments were converted into a lump sum. Rather, this is a case where total accrued and credited payments were paid in a total amount based upon an agreement which liad been carried out by the obligor to the extent of crediting and tendering payments upon an account inter partes. The alleged “sale” of the right to receive the accruals did not convert accrued income into capital. Helvering v. Smith, 90 F. 2d 590, 592; Hale v. Helvering, 85 F. 2d 819. There was, in fact, only payment of the total accruals to Lasky through an intermediary. The respondent’s determination is sustained. Decisions will be entered for the respondent.