El Juez Asociado Sr. Pérez Pimentel disintió.

SAN JUAN TRADING CO., INC., demandante y apelante, *v.* SECRETARIO DE HACIENDA DE PUERTO RICO, demandado y apelado.

Número 11075.

*Reasignado:* 11 de diciembre de 1957. *Resuelto:* 20 de noviembre de 1958.

*Luis E. Dubón* y *R. García Cintrón,* abogados de la apelante; *Hon. Secretario de Justicia José Trías Monge* y *Arnaldo P. Cabrera, Procurador Auxiliar,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

La corporación doméstica San Juan Trading Company, Inc., interpuso demanda contra el Tesorero (hoy Secretario de Hacienda) de Puerto Rico ante el antiguo Tribunal de Contribuciones, solicitando el reintegro de la suma de $3,367.64, más los intereses correspondientes. Luego de los trámites usuales, el tribunal dictó sentencia en favor de la demandante, pero únicamente por la suma de $168.38 más intereses. La demandante apela.

La San Juan Trading Co., Inc., como compradora y The Diamond Match Company de Maryland como vendedora, firmaron en 1933 un convenio para la venta en Puerto Rico de fósforos fabricados por la Diamond. Mediante ese acuerdo y con el propósito de darle ciertas seguridades a la vendedora en cuanto al pago del precio, las partes convinieron lo siguiente: 1) tan pronto hiciera un embarque de fósforos, la vendedora enviaría la factura correspondiente a la compra-

dora y un duplicado al Banco Nova Scotia de San Juan; 2) la compradora, diez días después del arribo de cada embarque, pagaría los arbitrios correspondientes al Tesorero de Puerto Rico; 3) al vender los fósforos a sus clientes de Puerto Rico, la compradora continuaría su práctica anterior de obtener de ellos giros pagaderos a los treinta días, por el precio de venta, el cual incluiría el costo de los fósforos a la compradora, la ganancia de ésta y los arbitrios; 4) la compradora entonces endosaría esos giros en favor de la vendedora y los entregaría para su cobro al Banco Nova Scotia; 5) la vendedora autorizaría al banco a adelantarle a la compradora la suma de $288 por cada mil gruesas de fósforos. Esa suma se cargaría a la cuenta de la vendedora, y le sería reembolsada al pagarse los giros; 6) el balance de los giros se utilizaría para pagar las facturas de los embarques y cualesquiera otros gastos incurridos por la compradora; 7) de haber algún sobrante se le acreditaría por el banco a la compradora luego de recibir instrucciones de la vendedora a tal efecto.

El convenio estuvo en vigor hasta 1939, sin que ocurriera cambio alguno en sus términos. Las operaciones de compraventa se realizaron siempre de acuerdo con sus estipulaciones. El 9 de mayo de 1938 comenzó a regir la Ley núm. 146 que imponía una contribución de 30 centavos sobre cada gruesa de fósforos cuadrados que se introdujera en el país y de 10 centavos sobre cada gruesa de fósforos redondos. La San Juan Trading Co., Inc., a partir de esa fecha, pagó bajo protesta el arbitrio sobre los fósforos cuadrados. En 6 de junio de 1939 interpuso demanda contra el Tesorero ante la Corte de Distrito de los Estados Unidos para Puerto Rico, solicitando la devolución de dichos arbitrios al alegar que la Ley núm. 146 era inconstitucional. El pleito fue resuelto en su favor por los tribunales federales y terminó definitivamente en 1941. Véase *San Juan Trading Co.* v. *Sancho*, 114 F.2d 969 (1940), cert. denegado 312. U.S. 702 (1941).

El 28 de diciembre de 1939, luego de conocido el fallo del tribunal federal de primera instancia, favorable a la San Juan Trading Co., ésta se comunicó por carta con The Diamond Match Company. Le informó que no obstante ese fallo el Tesorero insistía en cobrar el arbitrio de 30 centavos sobre los fósforos cuadrados extendiendo el mismo a los fósforos redondos para hacerlo uniforme, pero que la San Juan Trading Co. continuaría pagando bajo protesta y reclamando la devolución. Añadió lo siguiente: "En la eventualidad de que se haga un reembolso, tenemos derecho a él como propiedad nuestra . . .", pero a la vez expresó su conformidad de discutir una posible división de los reembolsos referentes a los embarques que habrían de hacerse a partir del 1 de enero de 1940.

El 12 de enero de 1940 la Diamond contestó la comunicación anterior informándole a la San Juan Trading Co. lo siguiente: 1) los reembolsos de arbitrios pagados sobre embarques de fósforos cuadrados hechos hasta el 21 de diciembre de 1939 pertenecerían a la San Juan Trading Co. o a sus clientes; 2) los pagados sobre embarques posteriores a esa fecha pertenecerían a la Diamond; 3) en el supuesto de que los tribunales de apelación sostuvieran la validez del arbitrio de 30 centavos sobre todos los fósforos, incluyendo los redondos, la San Juan Trading Co. no tendría derecho a reclamar suma alguna a la Diamond para pagar los arbitrios adicionales sobre los embarques de fósforos redondos enviados con anterioridad al 21 de diciembre de 1939. Se imponía esta exigencia en virtud de la primera concesión.

El 16 de enero de 1940 la San Juan contestó a la Diamond aceptando las citadas condiciones, pero dejó pendiente la cuestión de cómo habrían de pagarse los honorarios de los abogados que estaban a cargo del pleito en los tribunales federales.

En septiembre de 1941 el Tesorero devolvió a la San Juan Trading Co. la suma de $11,610 como reintegro de arbitrios pagados desde el 23 de diciembre de 1939 hasta el 16

de diciembre de 1940. De esa suma, la San Juan pagó $1,741.50 a los abogados y depositó los $9,868.50 restantes en la cuenta que la Diamond tenía en el Banco Nova Scotia, sin que aparentemente retuviera cantidad alguna para el pago de la contribución sobre ingresos.

Mediante comunicaciones de 25 y 26 de junio de 1945, tanto el Colector de Corporaciones como el Subtesorero de Puerto Rico requirieron de la San Juan Trading Co. el pago de la suma de $3,367.64 "correspondiente a contribuciones sobre ingresos retenida por esa corporación a Diamond Match Co." La carta del Subtesorero se refería a "la contribución adeudada por ustedes de acuerdo con su declaración anual de Contribución sobre Ingresos Retenida en el Origen, rendida por el año contributivo de 1941. . ."

El 12 de julio de 1945 la San Juan Trading Co. le envió una carta al Colector de Corporaciones incluyendo un cheque por $3,367.64 "en pago de su recibo núm. 240, año 1941, correspondiente a contribuciones sobre ingresos retenida por esta corporación a The Diamond Match Company. . ."

Unos días más tarde, el 10 de agosto de 1945, la San Juan Trading Co. escribió a la Diamond solicitando la devolución de esta última cantidad e informándole que se había visto obligada a pagarla porque "de acuerdo con la ley debíamos haber retenido y pagado el monto de la contribución de la cuenta de ustedes al momento en que le hicimos el reembolso." La Diamond contestó diciendo que había referido el asunto a sus abogados. La última comunicación que consta de los autos es una de 5 de septiembre de 1950, dirigida por la San Juan a la Diamond informándole haber comenzado el presente litigio y su intención de responsabilizar a la Diamond por el pago de la contribución en caso de que el Tribunal de Contribuciones fallara en favor del Tesorero.

Además de todo lo anterior, la prueba demuestra que The Diamond Match Co. es una corporación que no ha estado inscrita ni nunca "ha hecho negocios" en Puerto Rico (dentro del significado de esa frase en la Ley de Contribuciones.

sobre Ingresos) como tampoco ha rendido planillas. Asimismo quedó comprobado que todos los arbitrios sobre los fósforos se pasaron al consumidor y que en ninguna ocasión la Diamond envió dinero a la San Juan Trading Co. para pagar dichos arbitrios. La prueba demuestra, además, que la corporación doméstica incluyó en sus ingresos del año 1941 la participación que tuvo en los reembolsos de arbitrios y que pagó contribución sobre tales ingresos.

El tribunal de instancia, luego de analizar estos hechos, resolvió que el dinero recibido por la Diamond constituía ingreso tributable y que la San Juan venía obligada a retener y pagar la contribución correspondiente. Sin embargo, dictó sentencia en favor de la demandante por la suma de $168.38 por considerar que la contribución aplicable al caso era la de 19 por ciento que exigía la Ley núm. 31 de 12 de abril de 1941 (Leyes, pág. 479) y no la de 20 por ciento como había decidido el Tesorero, aplicando la Ley núm. 23 de 21 de noviembre de 1941 (Leyes, pág. 73). Pasamos a considerar los errores que la apelante imputa al tribunal sentenciador.

Sostiene la apelante, en primer término, que el tribunal incurrió en error al resolver que la suma de $9,868.50 remitida por ella a la Diamond Match Co. constituía ingreso tributable para esta última. Esa conclusión, dice, es contraria a algunas afirmaciones del propio tribunal en el sentido de que "los arbitrios se pagarían con fondos suplidos por The Diamond Match Co." y que ésta "fue la proveedora del dinero cobrado ilegalmente por el Tesorero." Basándose en tales afirmaciones, concluye la San Juan Trading Co. que "lo que hizo la Diamond Match Co. al recibir este dinero de la apelante fue simplemente reintegrarse de la suma que por igual cantidad había anticipado a ésta para el pago de los arbitrios de referencia" y que esa suma, por consiguiente, constituye una devolución de capital y no un ingreso.

Está completamente equivocada la apelante en su apreciación de los hechos. La prueba demuestra sin lugar a

dudas que la manera de pagar los arbitrios nunca se cambió([1]) y que el arreglo de 1939 entre las dos corporaciones se refería exclusivamente al derecho de propiedad sobre los reembolsos de los arbitrios pagados bajo protesta que, una vez conocido el fallo del tribunal federal, se esperaba habría de hacer el Tesorero. En ninguna ocasión la Diamond anticipó o suministró dinero a la apelante para pagar los arbitrios y, en consecuencia, el dinero recibido por ella proveniente del reembolso de esos arbitrios no fue una devolución de capital. Era la apelante la que adelantaba el dinero, pero éste le era devuelto dentro de un término de treinta días y tan pronto sus clientes pagaban el precio de venta, el

---

([1]) El único testigo y Vicepresidente de la demandante, Sr. Juan Ángel Franco, así lo admitió en varias ocasiones:

"P. ¿Cuál era el convenio? En relación con los arbitrios, de diciembre del treinta y nueve en adelante?

"R. Bueno, la forma de pagarlos no varió nunca en nada.

(T. E. pág. 15.)

. . . . . . . .

"P. Sr. Franco ¿qué ocasionó la variación en el arreglo a partir del 21 de diciembre de 1939, que tenía la San Juan Trading Company con la Diamond Match Company?

"R. En el arreglo no hubo variación ninguna. Solamente en la cuestión del reembolso del arbitrio exigieron ellos que fuera propiedad de ellos cualquier reembolso, que hubiera a partir de esa fecha.

(T. E. pág. 17.)

. . . . . . . .

"P. En relación con las contribuciones que le devolvieron antes del 39, ¿hubo la misma situación?

"R. No señor. El contrato que se hizo la distribución fue el mismo desde que empezamos hasta que terminaron nuestras relaciones con Diamond Match Company. Ahora, cuando surgió el pleito de devolución de contribuciones, ellos escribieron una carta, que se ha presentado ahí, diciendo que desde tal fecha, el 21 de diciembre de 1939, cualquier devolución de arbitrios se la tendríamos que devolver a ellos. Hay otra carta, donde le discutimos que qué razón había para eso, y contestaron siempre que o se lo devolvíamos o ponían la distribución de esos fósforos en manos de otra casa.

"P. *¿No fue porque ellos le habían pagado?*

"R. *No hay razón alguna.* Entonces nosotros pesamos entre devolverles a ellos esa parte y quedarnos con la distribución y resolvimos hacerlo así." (T. E. págs. 21, 22. **Énfasis nuestro.**)

El Sr. Franco aceptó también que en todas las ocasiones el **arbitrio** fue pasado al consumidor. (T. E. **pág. 25.**)

cual, como señalamos al principio, incluía los arbitrios. Lo que ocurrió en 1939 fue sencillamente una disputa entre las dos corporaciones en cuanto a quién habría de corresponder la esperada devolución de los arbitrios, (²) que en realidad era algo llovido del cielo ya que ninguna de las dos los había pagado, (³) y por el contrario se le habían pasado a los clientes de la San Juan Trading Co. y en última instancia a los consumidores. En esa disputa venció la Diamond por su superior fuerza económica y mediante la amenaza de retirarle a la apelante el derecho de vender sus productos en Puerto Rico. (⁴) Las afirmaciones del tribunal sentenciador, aunque sin duda un tanto imprecisas, tienen que ser examinadas a la luz de estas circunstancias.

Aclarados estos hechos, corresponde resolver si el dinero así recibido por The Diamond Match Co. constituye ingreso tributable de acuerdo con las disposiciones de ley pertinentes.

El párrafo (a) de la sec. 19 de la Ley 31 (Leyes, 1941, págs. 479, 509) enumera ciertas "cantidades de ingreso bruto" que en el caso de individuos no residentes o de corporaciones extranjeras (⁵) deberán considerarse como "ingreso derivado de fuentes radicadas dentro de Puerto Rico." Se mencionan determinadas clases de intereses, beneficios de sociedades o dividendos de corporaciones domésticas, compensaciones

---

(²) Se recordará que la San Juan Trading Co. inicialmente sostuvo que los arbitrios eran de su propiedad. Hubiese sido inaudito que la apelante hiciese tal alegación, si la Diamond le hubiese adelantado el dinero para pagarlos.

(³) Desde 1945 existe en nuestros estatutos una ley que cataloga como "enriquecimiento injusto" el ingreso neto derivado del reintegro de arbitrios siempre que estos se hubieren pasado a otra persona mediante la venta o traspaso de los artículos gravados. La ley impone una contribución de 80 por ciento sobre dicho ingreso en adición a cualquier otra contribución sobre ingresos vigente. Véase 13 L.P.R.A. secs. 2231 a 2240. Existe igual reglamentación en la ley federal. 26 U.S.C.A. secs. 700–706; *Wilson Milling Co.* v. *Commissioner*, 138 F.2d 249 (C.C.A. 8, 1943); cert. denegado, 320 U.S. 800 (1944).

(⁴) Véase el Exhibit 3 y el testimonio del Sr. Franco. (T. E. pág. 22.)

(⁵) Las disposiciones de esta sección son aplicables a las corporaciones extranjeras por mandato de la sec. 35.

por servicios personales, rentas o cánones de diversa índole, ingresos derivados de la venta de propiedad inmueble radicada en Puerto Rico y el montante recibido por el transporte de carga y pasajeros de Puerto Rico a los Estados Unidos o a países extranjeros. El párrafo (*b*) señala las deducciones aplicables en estas circunstancias y, luego, el párrafo (*c*) enumera las partidas que deberán considerarse como "ingresos derivados de fuentes fuera de Puerto Rico." El recobro de contribuciones no figura expresamente en ninguno de estos párrafos.

Las enumeraciones precedentes, sin embargo, no son las únicas medidas que provee la ley. El párrafo (*e*) de la sec. 19 aclara que "Partidas de ingreso bruto, gastos, pérdidas y deducciones que no sean los especificados en las subdivisiones (*a*) y (*c*), serán asignados o distribuídos como derivados de fuentes radicadas en o fuera de Puerto Rico, de acuerdo con reglamentos prescritos por el Tesorero."[6] Esta disposición incuestionablemente consagra la voluntad legislativa de imponer la contribución a cualquier ingreso obtenido de fuentes de Puerto Rico que no esté expresamente excluído por ley. *Helvering* v. *Suffolk*, 104 F.2d 505, 507 (1939); Allan Coggan, *Aliens and the federal income tax*, 5 Tax L. Rev. 253, 273 (1950); Anotación, *Source of income as within or without the United States under the Internal Revenue Code*, 160 A.L.R. 559, 590 (1946).

■■ Como es obvio que el dinero en este caso proviene de fuentes de Puerto Rico, debemos determinar si es parte del "ingreso bruto" según lo define la ley.[7] Tampoco ofrece dificultad alguna este problema. Desde hace ya algún tiempo ha quedado firmemente establecida la regla de que el dinero recibido por un contribuyente como reembolso de

[6] El Reglamento núm. 1 del Departamento de Hacienda provee en su art. 200 un método para la distribución de ingresos provenientes de la venta de propiedad mueble y dispone que cuando se derive de otros negocios el ingreso deberá ser distribuído específicamente o prorrateado proporcionalmente por el contribuyente, sujeto a la aprobación del Tesorero.

[7] Véase la sección 15.

contribuciones ilegal o erróneamente cobradas constituye un ingreso tributable que debe asignarse al año en el cual se recibe el reembolso. *Rothensies* v. *Electric Storage Battery Co.*, 329 U.S. 296, 298 (1946); *Nash* v. *Commissioner*, 88 F.2d 477 (C.C.A. 7, 1937); *Universal, Inc.* v. *Commissioner*, 109 F.2d 616 (C.C.A. 7, 1940); *Cf. Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359 (1931). Esa regla se ha aplicado a "corporaciones extranjeras" bajo disposiciones prácticamente idénticas a las de la sec. 19 de nuestra ley. *Helvering* v. *Suffolk Co.*, supra. Sabemos, además, que la definición legal de la frase "ingreso bruto" —que necesariamente debemos aplicar por su relación con la sec. 19, *Helvering* v. *Suffolk*, supra—no excluye otras fuentes en ella no especificadas y que en términos ordinarios y prácticos se consideren como ingreso de una persona. Dicha frase exige una amplia y generosa interpretación que dé cumplimiento al propósito legislativo de ejercer a plenitud la facultad de imponer tributos. *Flax* v. *Tesorero*, 76 D.P.R. 390, 395 (1954); *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426, 429, 430 (1955); 1 Mertens, *The Law of Federal Income Taxation* (ed. de 1956) sec. 5.03; Magill, *Taxable Income* (1945) *passim* y especialmente las págs. 16–23 y 443–451. Resolvemos, en consecuencia, que el dinero recibido por The Diamond Match Co. proveniente de arbitrios devueltos por el gobierno de Puerto Rico constituyó un ingreso tributable para dicha corporación de acuerdo con las disposiciones pertinentes de la Ley de Contribuciones sobre Ingresos.(⁸)

■■ La San Juan Trading Co., Inc., señala que el tribunal de instancia incurrió en un segundo error "al resolver

---

(⁸) La apelante sostiene que debemos aplicar en este caso la llamada "regla del beneficio contributivo" (*tax benefit rule*) porque la Diamond "no dedujo de sus ingresos la cantidad que anticipó a la apelante . . . para el pago de los arbitrios y . . . , por consiguiente, no derivó beneficio contributivo alguno del anticipo de estos fondos a la apelante." Como la prueba demuestra palmariamente que la Diamond no hizo anticipo alguno ni suministró dinero para pagar los arbitrios, se hace innecesario resolver si la citada regla encuentra apoyo en nuestra Ley de 1924, según enmendada. Examínense sobre dicha regla 1 Mertens, *op. cit.*,

que la apelante venía obligada por ley a retener y pagar al gobierno insular contribución en el origen" sobre el dinero devuelto a The Diamond Match Co. Las disposiciones legales aplicables son las siguientes:

"Sección 22.—(a) Todas las personas, cualquiera que sea la capacidad en que actúen, incluyendo arrendatarios o acreedores hipotecarios de propiedades mueble e inmueble, fiduciarios, principales o patronos y todos los funcionarios y empleados de El Pueblo de Puerto Rico, y todas las corporaciones y sociedades que tengan el control, recibo, custodia, disposición o pago de intereses, rentas, sueldos, salarios, comisiones, premios, anualidades, compensaciones, remuneraciones, emolumentos u otras ganancias, dividendos, participación en beneficios de sociedades y corporaciones, y otros beneficios o ingresos anuales o periódicos, fijos o determinables, de cualquier individuo no residente que no sea ciudadano de Puerto Rico, (a menos que se disponga otra cosa en los reglamentos que el Tesorero prescriba en virtud de la sección 19) deberán deducir y retener de dichas ganancias, dividendos, beneficios e ingresos anuales o periódicos, la contribución normal y adicional fijada por esta ley a los individuos no residentes que no sean ciudadanos de Puerto Rico; *Disponiéndose*, que en caso de valores cuyos dueños sean ignorados, dicha contribución será deducida y retenida de los intereses de tales valores." (Leyes, 1941, pág. 515.)

"Sección 35.—En el caso de corporaciones y sociedades extranjeras sujetas a tributación en virtud de este título que no se dediquen a industria o negocio dentro de Puerto Rico y que no tengan oficina o punto de negocio en la isla, se deducirá y retendrá en el origen y en la misma forma y sobre las mismas partidas de ingreso que se proveen en la sección 22, una contribución del diez y nueve (19) por ciento de dicho ingreso, y dicha contribución deberá ser declarada y pagada del mismo modo y sujeta a las mismas condiciones que se disponen en la sección 22." (Leyes, 1941, pág. 527.)

secs. 7, 34–7.37; Magill, *op. cit.*, págs. 189–193 y se observará que la misma no tiene aplicación a los hechos de este caso. La regla del beneficio contributivo se incorporó a nuestra ley de 1954 por vía de la sec. 22(b)(12), 13 L.P.R.A. sec. 3022.

Es obvio que el ingreso en este caso no proviene de intereses, [9] rentas, sueldos, salarios, comisiones, premios, anualidades, compensaciones, remuneraciones, emolumentos, dividendos o participaciones en los beneficios de una corporación. Debemos, por consiguiente, determinar si está comprendido en los términos "otras ganancias" y "otros beneficios o ingresos anuales o periódicos, fijos o determinables". Siendo obviamente un ingreso determinable, [10] concentraremos nuestra atención en el primer requisito. El Reglamento núm. 1 del Departamento de Hacienda provee lo siguiente en su art. 212 (b):

"No es necesario que el ingreso se haya pagado anualmente si se ha pagado periódicamente: es decir, de tiempo en tiempo, fuere o no en intervalos regulares. El ingreso no es menos determinable o periódico por el hecho de que se aumente o reduzca el período de tiempo dentro del cual vayan a hacerse los pagos de acuerdo con el deseo de alguien o con la ocurrencia de algún suceso." [11]

---

[9] Parte del ingreso correspondía a los intereses que el tribunal federal ordenó pagar y que se computaban a partir de la fecha de interposición de la demanda. Ley núm. 8 de 19 de abril de 1927, Leyes, pág. 123.

[10] El Reglamento núm. 1 del Departamento de Hacienda en su art. 212 expresa que el ingreso es determinable "cuando existe una base de cálculo por medio de la cual se pueda precisar (*ascertained*) la cantidad que debe pagarse." Nos hemos visto obligados a traducir éste y otros artículos del Reglamento porque, aunque parezca extraño, no existe una versión en español del mismo.

[11] Este artículo provee, además, que "El ingreso derivado de la venta en Puerto Rico de propiedad mueble o inmueble no es un ingreso fijo o determinable, anual o periódico." Como la sec. 19 (a) menciona expresamente, como ingreso derivado de fuentes de Puerto Rico, a la ganancia o ingreso que se obtenga de la venta de propiedad inmueble ubicada en Puerto Rico, y como en el art. 200 del Reglamento núm. 1 se interpreta que también el ingreso obtenido de la manufactura o venta de propiedad mueble tangible puede ser uno derivado de fuentes de Puerto Rico y se provee una fórmula para identificar dicho ingreso, surge la cuestión de si la definición de ingreso de la sec. 19 va más allá que el método provisto por la sec. 22 para la retención del tributo en el origen. Examínese *Commissioner* v. *Wodehouse*, 337 U. S. 369, 384 (1949). No tenemos que resolver esa cuestión en este caso porque estamos convencidos de que el ingreso que obtuvo The Diamond Match Co., aunque incidental a unas ventas de propiedad mueble, no se deriva de éstas sino

La ley y el reglamento federales contenían, a la fecha del pago que nos ocupa, disposiciones idénticas a las nuestras.([12]) Interpretando esas disposiciones, los tribunales federales dictaminaron que un *ingreso* podía ser fijo o determinable, anual o periódico aunque el mismo no se *pagara* anual o periódicamente.([13]) Estamos convencidos de que esa interpretación es correcta y que, por consiguiente, debemos adoptarla. De lo contrario bastaría, para evitar la contribución, que se acumularan en un solo pago cantidades que debieron o pudieron pagarse anual o periódicamente o el derecho a las cuales surgió de tiempo en tiempo.

El principal precedente en la jurisdicción federal lo constituye *Commissioner* v. *Wodehouse*, 337 U.S. 369 (1949). Wodehouse, el conocido escritor inglés, recibió en 1938 y 1941 ciertos pagos de editores norteamericanos por el derecho de publicar algunas de sus obras literarias en forma de serie y de libro. Los pagos se hicieron por adelantado y en forma global (*lump sum*). El Tribunal Supremo de los Estados Unidos resolvió, a la luz de las secs. 212(a), 211 y 119 de la Ley de Rentas Internas federal, correspondientes a las ya citadas secciones de nuestra ley, que tales pagos constituían derechos de propiedad literaria (*royalties*) y que eran "fijos o determinables" y "anuales o periódicos".

"Una vez se haya determinado que si el demandado hubiese recibido esos pagos anualmente o de tiempo en tiempo tendría, durante la vida de su derecho de propiedad literaria, que haberlos incluído en su ingreso bruto para fines de la contribu-

---

de la actuación del gobierno al imponer una contribución ilegal, que la Diamond nunca pagó ni anticipó dinero para pagar, y el recobro de la cual constituyó para ella un verdadero golpe de fortuna. *Cf.* 160 A.L.R. *cit.* supra, pág. 588. La Ley de 1954 resuelve el problema planteado por las diferencias de redacción entre las secs. 19 y 22 al utilizar el mismo lenguaje tanto para la definición de ingreso proveniente de Puerto Rico como para la obligación de retener. 13 L.P.R.A. secs. 3143 y 3211.

([12]) 10 Mertens, *op. cit.* (ed. de 1948) sec. 56.13.

([13]) En 1956 se hizo figurar esta interpretación en el Reglamento federal. Véase Reg. sec. 1.1441-2(a) (2) citado en 8 Mertens, *op. cit.*, (ed. de 1957) sec. 47B.12, y en el volumen de la misma obra titulado *Regulations*.

ción sobre ingresos federal, resulta igualmente claro que el recibir esos pagos en una sola suma como pago total, por adelantado, por el disfrute de los mismos derechos durante la vida de la propiedad literaria, no puede darles exención contributiva, por la razón única de haber sido consolidados en una sola cantidad. No puede interpretarse ninguna ley de rentas de manera que produzca ese resultado a menos que existan disposiciones a tales efectos completamente claras. No existen . tales disposiciones en este caso." (Pág. 393.)

Luego de explicar que el propósito de las palabras "anuales" y "periódicos" había sido principalmente establecer una diferencia entre ganancias de capital y otras clases de ingresos, añadió el Tribunal:

"En el presente caso, el derecho a la propiedad literaria que habría de obtenerse tenía aún por extinguir su vida original y completa de veintiocho años, luego del pago adelantado recibido por el autor cubriendo el uso o el privilegio de usar algunos derechos correspondientes a tal propiedad. El ingreso fijo y determinable, desde el punto de vista fiscal, puede obtenerse de pagos anuales o de otra índole sin alterar en lo mínimo la necesidad o la razón de imponerle la contribución a ese ingreso o de retener parte de él en la fuente. Un pago adelantado que cubra los veintiocho años de la propiedad literaria cae bajo el propósito y el alcance de las leyes de rentas, tanto como, o aún mejor, que dos o más pagos parciales de la misma cantidad." (Pág. 394.)

En igual sentido, y también con relación al derecho de propiedad literaria, se pronuncian *Sabatini* v. *Commissioner*, 98 F.2d 753, 755 (C.C.A. 2, 1938) y *Rohmer* v. *Commissioner*, 153 F.2d 61, 63 (C.C.A. 2, 1946) ; cert. denegado 328 U.S. 862 (1946). En esta última sentencia el Juez Jerome Frank asimiló la situación al pago de intereses de varios años en una sola suma o al pago por adelantado de cánones de alquiler. "La frase, decidimos, describe la clase o naturaleza del ingreso y no la manera como se paga." (Pág. 63.)

En *Commissioner* v. *Raphael*, 133 F.2d 442 (C.C.A. 9, 1943) se resolvió que los intereses recibidos por el contribuyente como parte de una sentencia judicial y los intereses

sobre la sentencia, ambos pagados de una sola vez, constituían una "ganancia determinable anual o periódica". En *United States* v. *Balanovski*, 131 F. Supp. 898 (D.C.N.Y., 1955) se sostuvo que la frase "ingreso anual o periódico" incluye descuentos recibidos por una sociedad extranjera por compras realizadas en los Estados Unidos, aunque las compras se hicieron todas en un solo año, intermitentemente, y de distintos suplidores.([14]) Examínense, además, *Ehrlich* v. *Higgins*, 52 F. Supp. 805, 807 (D.C.N.Y., 1943) y *Misbourne Pictures Limited* v. *Johnson*, 189 F.2d 774 (C.C.A. 2, 1951).

En el caso que nos ocupa, aunque los arbitrios fueron reembolsados de una sola vez, no hay duda que el derecho a ellos iba surgiendo periódicamente, según iban pagándose bajo protesta. El período de prescripción para solicitar el reintegro se iniciaba al efectuarse cada uno de los pagos. (Ley núm. 8 de 19 de abril de 1927, Leyes, pág. 123.) No pueden cambiar esta conclusión las circunstancias de que la San Juan Trading Co. decidiera acumular sus reclamaciones en un solo procedimiento judicial, que el tribunal federal, en consecuencia, también ordenara la devolución de todos los arbitrios en una sola sentencia, y que los funcionarios del gobierno de Puerto Rico decidieran satisfacerla en un único pago. La "naturaleza y clase del ingreso" no podían ser cambiadas por las conveniencias de los trámites judiciales y administrativos.

■ Una vez esclarecida esta cuestión no puede haber dudas de que la San Juan Trading Co. estaba obligada por ley a retener la contribución que correspondía pagar a la Diamond. La sec. 22(a), en relación con la sección 35, imponía ese deber a "todas las corporaciones y sociedades" que tuvieran el "control, recibo, custodia, disposición o pago de . . . beneficios o ingresos anuales o periódicos" de "cor-

---

([14]) En apelación—236 F.2d 298 (1956), cert. denegado 352 U.S. 968 (1957) —se resolvió que la sociedad "hacía negocios" en los Estados Unidos y estaba, por consiguiente, sujeta a la contribución federal.

poraciones y sociedades extranjeras sujetas a tributación" de sus ingresos y "que no se dediquen a industria o negocio dentro de Puerto Rico y que no tengan oficina o punto de negocio en la isla . . ." . Actuó, pues, correctamente la San Juan Trading Co. cuando en el año 1941 informó esos ingresos en su planilla informativa sobre contribución retenida en el origen y cuando en el año 1945 pagó la contribución correspondiente "retenida por esta corporación a The Diamond Match Company". Si en realidad la corporación doméstica no ha recobrado de la Diamond el dinero así pagado es algo que a ellas compete dilucidar en una acción independiente de ésta y de acuerdo con las disposiciones de ley aplicables.

*Se confirmará la sentencia apelada.*

El Juez Asociado Sr. Santana Becerra no intervino.