SAN JUAN TRADING CO., INC., Plaintiff and Appellant, v. SECRETARY OF THE TREASURY, Defendant and Appellee.

No. 11075. Resubmitted December 11, 1957.—Decided November 20, 1958.

---

*Luis E. Dubón* and *R. García Cintrón* for appellant. *José Trías Monge, Attorney General,* and *Arnaldo P. Cabrera, Assistant Attorney General,* for appellee.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

San Juan Trading Company, Inc., a domestic corporation, filed a complaint in the former Tax Court to recover from the Treasurer (now Secretary of the Treasury) of Puerto Rico the sum of $3,367.64 and interest thereon. After the usual proceedings, the court rendered judgment for the plaintiff but only for the sum of $168.38 plus interest. The plaintiff appealed.

San Juan Trading Co., Inc., as buyer, and The Diamond Match Company of Maryland, as seller, signed an agreement in 1933 for the sale in Puerto Rico of matches manufactured by Diamond. By virtue of that agreement and for the pur-

pose of securing to the seller the payment of the price, the parties agreed as follows: (1) immediately upon shipment of a quantity of matches, the seller shall invoice the same to the buyer and shall send a duplicate copy to the Bank of Nova Scotia of San Juan; (2) the buyer, within ten days after the arrival of each shipment, shall pay to the Treasurer of Puerto Rico the corresponding excise tax; (3) the buyer at the time of delivery of the matches sold to its customers in Puerto Rico, shall continue its former practice of obtaining from the customers a draft payable at 30 days, for the amount of the selling price, which selling price shall include the cost of the matches to the buyer, the buyer's profit, and the excise tax; (4) the buyer shall then endorse those drafts to the order of the seller and deliver the same to the Bank of Nova Scotia, for collection; (5) the seller shall authorize the bank to credit to the account of the buyer the sum of $288 for each 1,000 gross of matches. That sum shall be charged to the seller's account and reimbursed upon payment of the drafts; (6) the balance of the drafts shall be applied toward the payment of the seller's invoices of the shipments and any other expenses incurred by the buyer; (7) any surplus remaining shall be credited by the bank to the buyer when and as instructed to do so by the seller.

The agreement was in force until 1939, without its terms being altered in any way. The sale operations were always carried out in pursuance of the terms of the agreement. Act No. 146, which imposed a tax of 30 cents on each gross of square stick matches introduced in the country and 10 cents per gross of round stick matches, went into effect on May 9, 1938. As of that date San Juan Trading Co., Inc. paid under protest the excise tax on the square matches. On June 6, 1939, it filed a complaint against the Treasurer in the United States District Court for Puerto Rico, to recover the excise tax on the ground that Act No. 146 was unconstitutional. The suit was decided by the federal court in its favor and definitively terminated in 1941. See *San Juan*

*Trading Co.* v. *Sancho*, 114 F.2d 969 (1940), *cert. denied,* 312 U.S. 702 (1941).

On December 28, 1939, after learning of the judgment of the federal district court, which was favorable to San Juan Trading Co., the latter wrote a letter to The Diamond Match Company informing that, notwithstanding the judgment of the federal court, the Treasurer insisted on collecting the 30-cent excise tax on square matches, extending it to the round matches so as to make the tax uniform, but that San Juan Trading Co. would continue paying under protest and suing for its refund. It added the following: "In the event of refund, we are entitled to it as our property. . . ." but at the same time it stated that it was willing to talk about a possible division of such refunds as might be made on shipments delivered after January 1, 1940.

On January 12, 1940, Diamond answered the previous letter informing the San Juan Trading Co. as follows: (1) the refund of excise taxes paid on shipments of square matches made up to and including December 21, 1939, would be considered as belonging to San Juan Trading Co. or to its customers; (2) after that date such payments of taxes as are made will be paid to Diamond; (3) in the event the court of appeals finally upholds the validity of the 30-cent excise tax on all matches, including the round sticks, San Juan Trading Co. will make no claim against Diamond for the additional taxes on the round stick matches delivered prior to December 21, 1939. This requirement was made necessary in view of the first concession.

On January 16, 1940, San Juan Trading Co. replied to The Diamond Co. accepting those conditions but left pending the question of fees to be paid to the attorneys who were handling the suit in the federal courts.

In September 1941, the Treasurer refunded to San Juan Trading Co. the sum of $11,610, covering the refund of excise tax paid from December 23, 1939 to December 16, 1940. Out of this sum the San Juan paid $1,741.50 to the

attorneys and deposited the remaining $9,868.50 in the account of The Diamond Co. at the Bank of Nova Scotia, without apparently withholding any amount for the payment of income taxes.

By letters of June 25 and 26, 1945, both the Collector of Corporations and the Assistant Treasurer of Puerto Rico demanded from San Juan Trading Co. payment of the sum of $3,367.64 "covering income taxes withheld by that corporation from Diamond Match Co." The letter of the Assistant Treasurer referred to "the tax due by your Company in accordance with your annual return of Income Tax Withheld at the Source for the taxable year 1941. . . ."

On July 12, 1945, San Juan Trading Co. wrote a letter to the Collector of Corporations enclosing a check for $3,367.64 "in payment of our receipt No. 240, year 1941, covering income taxes withheld by this corporation from The Diamond Match Company. . . ."

A few days later, August 10, 1945, San Juan Trading Co. wrote to Diamond requesting reimbursement of the latter amount and informing it that it had been forced to pay the tax because, "under the law we should have retained and paid the amount of the tax for your account at the time of making the refund to you. . . ." The Diamond replied that it had referred the matter to its attorneys. The last letter which appears in the record is dated September 5, 1950, addressed by San Juan Trading to Diamond, informing that it had filed suit and intended to hold the Diamond liable for the payment of the tax in the event the Tax Court should render judgment in favor of the Treasurer.

In addition to the foregoing, the evidence shows that The Diamond Match Co. is a corporation which has not been registered and has never "engaged in business" in Puerto Rico (within the meaning of this term in the Income Tax Act), or rendered any returns. It was also established that all the excise taxes on matches were passed to the consumer, and that Diamond never sent money to San Juan Trading

Co. to pay for such taxes. The evidence further shows that the domestic corporation included in its 1941 income its share in the refund of excise taxes and that it paid tax on such income.

After analyzing these facts, the lower court held that the money received by Diamond was taxable income and that San Juan Trading was bound to withhold and pay the tax thereon. However, it rendered judgment for plaintiff for the sum of $168.38 on the ground that the applicable tax in the case was 19 per cent, as required by Act No. 31 of April 12, 1941 (Sess. Laws, p. 478), and not 20 per cent according to the ruling of the Treasurer, applying Act No. 23 of November 21, 1941 (Sess. Laws, p. 74). We turn to consider the errors which the appellant alleges were committed by the trial court.

■ The appellant first maintains that the court erred in holding that the sum of $9,868.50, which it had sent to The Diamond Match Co., was income taxable to the latter. That conclusion, it contends, is contrary to some of the statements made by the court in the sense that "the excise taxes shall be paid with funds provided by The Diamond Match Co.," and that the latter "provided the money illegally collected by the Treasurer." Based on these statements, San Juan Trading Co. concludes that "what The Diamond Match Co. did when it received this money from the appellant was simply to recover the sum which in like amount it had advanced to San Juan Trading to pay for the excise taxes in question," and, consequently, that that sum constitutes a refund of capital and not an income.

The appellant's weighing of the facts is absolutely erroneous. The evidence shows beyond any doubt that the manner of paying the excise tax never changed,[1] and that the 1939

[1] It was so admitted on several occasions by Juan Ángel Franco, vice president of the plaintiff, who was the only witness:

"Q. What was the agreement regarding the excise taxes, from and after December 1939?

agreement between the two corporations referred exclusively to the ownership right to the refund of the excise tax paid under protest which was expected to be made by the Treasurer, once the decision of the federal court was handed down. Diamond at no time advanced or furnished to the appellant the money to pay for the taxes, and, consequently, the money which it received by way of refund of those excises was not a return of capital. The money was advanced by the appellant, and it was repaid to it within 30 days and as soon as its customers paid the selling price, which, as pointed out earlier, included the excise tax. What happened in 1939 was simply a dispute between the two corporations as to who was entitled to the expected refund of the excise tax,[2] which in fact was a

---

A. Well, the manner of paying them never changed at all. (Tr. Evid. 15.)

.        .        .        .        .        .        .

Q. Mr. Franco, what caused the change in the agreement as of December 21, 1939, which San Juan Trading Company had with Diamond Match Company?

A. There was no change in the agreement. Only in the matter of the refund of the tax they claimed that they were entitled to any refund made after that date. (Tr. Evid. 17.)

.        .        .        .        .        .        .

Q. As respects the taxes refunded prior to 1939, was the situation the same?

A. No, sir. The contract providing for the distribution remained unchanged from the commencement until the termination of our relations with Diamond Match Company. However, when the suit for tax refund was instituted they wrote a letter, which was presented here, stating that as of that date, December 21, 1939, we would have to return to them any refund of excise taxes. There is another letter in which we discussed their reason for such request, and they always answered that we return it to them or else they would place the distribution of the matches with another firm.

Q. *Was it not because they had paid to you?*

A. *There is no reason at all.* Then we wondered whether to return that amount to them and retain the agency, and we decided to do it that way." (Tr. Evid. 21, 22.) (Italics ours.)

Mr. Franco also admitted that the excise tax was always passed to the consumer. (Tr. Evid. 25.)

[2] It will be recalled that San Juan Trading Co. maintained in the beginning that the excise taxes were its property. It would have been something unheard-of for the appellant to make such allegation if the Diamond had advanced the money to pay them.

godsend since neither of them had paid it,[3] and, on the contrary, had passed it to the customers of San Juan Trading Co. and ultimately to the consumers. Diamond prevailed in that dispute by reason of its superior economic strength and the threat to deprive the appellant of the right to sell its products in Puerto Rico.[4] The statements of the trial court, although without doubt somewhat inaccurate, must be examined in the light of these circumstances.

Having clarified these facts, let us see whether the money received by The Diamond Match Co. is taxable income under the provisions of the applicable law.

■ Section 19 (a) of Act No. 31 (Sess. Laws 1941, pp. 478, 508) specifies certain "items of gross income" which in the case of nonresident individuals or foreign corporations [5] shall be treated as "income from sources within Puerto Rico." Certain classes of interest, partnership profits or dividends from domestic corporations, compensation for personal services, rentals or royalties of different kinds, income from the sale of real property located in Puerto Rico, and the amount received from the transportation of freight and passengers from Puerto Rico to the United States or to foreign countries, are listed. Paragraph (b) specifies the deductions allowed in these circumstances and then paragraph (c) also specifies the items which shall be treated as "income from sources without Puerto Rico." The recovery of taxes is not expressly mentioned in any of these paragraphs.

---

[3] Since 1945, there is in our statutes a law which classes as "unfair profiteering" the net income derived from the refund of excises whenever they have been passed to another person through the sale or transfer of the articles taxed. The Act levies a tax of 80 per cent on such income in addition to any other income tax in force. See 13 L.P.R.A. §§ 2231–40. A like regulation exists in the federal law. 26 U.S.C.A. §§ 700–06; *Wilson Milling Co.* v. *Commissioner*, 138 F.2d 249 (C.C.A. 8, 1943), *cert. denied*, 320 U.S. 800 (1944).

[4] See Exhibit 3 and Franco's testimony. (Tr. Evid. 22.)

[5] The provisions of this section apply to foreign corporations by operation of § 35.

The preceding enumeration is not, however, the only measure provided by the Act. Section 19(e) provides that "Items of gross income, expenses, losses and deductions, other than those specified in subdivisions (a) and (c) shall be allocated or apportioned to sources within or without Puerto Rico under regulations prescribed by the Treasurer." [6] This provision unquestionably sanctions the legislative intent to levy the tax on all income from sources within Puerto Rico which is not expressly excluded by law. *Helvering v. Suffolk Co.*, 104 F.2d 505, 507 (1939); Allan Coggan, *Aliens and the Federal Income Tax*, 5 Tax L. Rev. 253, 273 (1950); Annotation, *Source of income as within or without the United States under the Internal Revenue Code*, 160 A.L.R. 559, 590 (1946).

■■ It being obvious that the money in this case is derived from sources within Puerto Rico, let us determine whether it is part of the "gross income" defined in the Act.[7] This problem presents no difficulty either. It is a well-settled rule that money received by a taxpayer by way of refund of taxes unlawfully or erroneously collected is income taxable in the year of refund. *Rothensies v. Electric Storage Battery Co.*, 329 U.S. 296, 298 (1946); *Nash v. Commissioner*, 88 F.2d 477 (C.C.A. 7, 1937); *Universal Inc. v. Commissioner*, 109 F.2d 616 (C.C.A. 7, 1940); *cf. Burnet v. Sanford & Brooks Co.*, 282 U.S. 359 (1931). This rule has been applied to "foreign corporations" under provisions practically identical with those of § 19 of our Act. *Helvering v. Suffolk Co., supra.* We know also that the legal definition of the phrase "gross income" —which we are bound to apply because of its relation to § 19, *Helvering v. Suffolk, supra*—does not exclude other sources not specified therein

---

[6] Regulation No. 1 of the Treasury Department provides in its art. 200 a method for allocating income from the sale of personal property, and provides that when it is derived from other business the income shall be specifically allocated or equitably apportioned by the taxpayer, subject to the approval of the Treasurer.

[7] See § 15.

and which in ordinary and practical terms are treated as income of a person. This phrase calls for a general and broad interpretation which will meet the legislative intent of exercising in full the power of taxation. *Flax* v. *Treasurer*, 76 P.R.R. 365, 370 (1954); *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426, 429, 430 (1955); 1 Mertens, *The Law of Federal Income Taxation* § 5.03 (1956 ed.); Magill, *Taxable Income* (1945), *passim*, at 16–23 and 443–51. Consequently, we hold that the money received by The Diamond Match Co. by way of excise taxes refunded by the Government of Puerto Rico constituted taxable income of that corporation under the applicable provisions of the Income Tax Act.[8]

San Juan Trading Co., Inc. points out that the lower court committed a second error "in holding that the appellant was bound by law to withhold and pay at the source to the Insular Government the tax" on the money refunded to The Diamond Match Co. The applicable legal provisions are the following:

"Section 22.— (*a*) All persons, in whatever capacity acting, including lessees or mortgagors of real or personal property, fiduciaries, employers, and all officers and employees of The People of Puerto Rico, and all corporations and partnerships having the control, receipt, custody, disposal, or payment of interest, rent, salaries, wages, commissions, premiums, annuities, compensations, remunerations, emoluments, or other gains, dividends, participation in partnership and corporation profits, and

---

[8] The appellant maintains that we ought to apply in this case the so-called "tax-benefit rule," since Diamond "did not deduct from its income the amount which it advanced to the appellant . . . for the payment of excise taxes and . . . consequently, it did not derive any tax benefit from the advance of these funds to the appellant." Since the evidence shows clearly that Diamond did not make any advances or furnished any money to pay the excise taxes, we need not decide whether that rule finds support in the Act of 1924, as amended. See, in connection with this rule, 1 Mertens, *op. cit. supra* § § 7.34–7.37; Magill, *op. cit. supra* at 189–93, and it will be noted that it does not apply to the facts of this case. The tax-benefit rule was incorporated in our Act of 1954 through § 22(*b*)(12), 13 L.P.R.A. § 3022.

other fixed or determinable annual or periodical profits or income, of any non-resident individual not a citizen of Puerto Rico, shall (except as otherwise provided in regulations prescribed by the Treasurer under Section 19) deduct and withhold from such annual or periodical gains, dividends, profits or income, the normal and additional tax fixed by this Act on any non-resident individual not a citizen of Puerto Rico; *Provided,* That in the case of securities whose owners are unknown, said tax shall be deducted and withheld from the interest on such securities."   (Laws 1941, p. 514.)

"Section 35.—In the case of foreign corporations and partnerships, subject to taxation under this title, not engaged in industry or business within Puerto Rico and not having any office or place of business therein, there shall be deducted and withheld at the source in the same manner and upon the same items of income, as is provided in Section 22, a tax of nineteen (19) per cent thereof, and such tax shall be returned and paid in the same manner and subject to the same conditions as provided in Section 22."   (Laws 1941, p. 526.)

It is obvious that the income in this case is not derived from interest,[9] rent, salaries, wages, commissions, premiums, annuities, compensations, remunerations, emoluments, dividends, or participation in corporation profits. We must therefore determine whether it comes within the terms "other gains" and "other fixed or determinable annual or periodical profits or income." It being obviously determinable income,[10] we will direct our attention to the first requirement. Regulation No. 1 of the Treasury Department provides in art. 212(b) as follows:

". . . The income need not be paid annually if it is paid periodically; that is to say, from time to time, whether or not at regular intervals. That the length of time during which the payments are to be made may be increased or diminished

---

[9] Part of the income represented interest upon the judgment of the federal court, computed as of the filing date of the complaint. Act No. 8 of April 19, 1927 (Sess. Laws, p. 124.)

[10] Regulation No. 1 of the Treasury Department provides in art. 212 that income is determinable "whenever there is a basis of calculation by which the amount to be paid may be ascertained."

in accordance with some one's will or with the happening of an event does not make the payments any the less determinable or periodical. . . ." [11]

The federal act and the regulations contained provisions identical with ours at the time of the payment under consideration.[12] Construing those provisions, the federal courts ruled that an *income* could be fixed or determinable, annual or periodical, even though it was not paid annually or periodically.[13] We are convinced that that construction is correct and that we should therefore adopt it. Otherwise, to avoid the tax it would suffice to accumulate in a single payment amounts which should or could have been paid annually or periodically, or the right to which accrued from time to time.

The controlling precedent in the federal jurisdiction is *Commissioner* v. *Wodehouse*, 337 U. S. 369 (1949). Wodehouse, the well-known English author, received in 1938 and 1941 certain payments from United States publishers for the

[11] This article also provides that "The income derived from the sale in Puerto Rico of property, whether real or personal, is not fixed or determinable annual or periodical income." Since § 19 (a) expressly mentions, as income from sources within Puerto Rico, the gains or income from the sale of real property located in Puerto Rico, and since according to art. 200 of Regulation No. 1 the interpretation placed is that the income from the manufacture or sale of tangible personal property may be derived from sources within Puerto Rico, and a formula is provided for determining such income, the question arises whether the definition of income in § 19 goes beyond the method provided by § 22 for withholding the tax at the source. See *Commissioner* v. *Wodehouse*, 337 U.S. 369, 384 (1949). We need not decide that question here because we are convinced that the income received by The Diamond Match Co., although incidental to certain sales of personal property, is not derived from such sales but is the result of the action on the part of the Government in levying an illegal tax, which Diamond never paid nor advanced the money to pay, and the recovery of which was truly a stroke of good fortune. *Cf.* 160 A.L.R. *supra* at 588. The Act of 1954 solves the problem as to the differences in the language used in § § 19 and 22, in employing the same language both for the definition of income derived from Puerto Rico and for the obligation to withhold. 13 L.P.R.A. § § 3143 and 3211.

[12] 10 Mertens, *op. cit.* § 56.13.

[13] This was the construction placed in 1956 upon the federal regulation. See Reg. § 1.1441–2 (a) (2), cited in 8 Mertens, *op. cit.* § 47B.12 (1957 ed.), and in the volume of the same work entitled *Regulations*.

right to publish his literary works in serial and book form. The payments were made in advanced and in a lump sum. The United States Supreme Court held, in the light of §§ 212(a), 211 and 119 of the Federal Internal Revenue Act, counterpart of the above-mentioned sections of our Act, that such payments constituted royalties for copyright and that they were "fixed or determinable" and "annual or periodical."

"Once it has been determined that the receipts of the respondent would have been required to be included in his gross income for federal income tax purposes if they had been received in annual payments, or from time to time, during the life of the respective copyrights, it becomes equally clear that the receipt of those same sums by him in single lump sums as payments in full, in advance, for the same rights to be enjoyed throughout the entire life of the respective copyrights *cannot,* solely by reason of the consolidation of the payment into one sum, render it tax exempt. No Revenue Act can be interpreted to reach such a result in the absence of inescapably clear provisions to that effect. There are none such here." (At 393.)

After stating that the purpose of the words "annual" and "periodical" had been mainly to establish some difference between capital gains and other types of income, the Court added:

"In the instant case, each copyright which was to be obtained had its full, original life of 28 years to run after the advance payment was received by the author covering the use of or the privilege of using certain rights under it. Fixed and determinable income, from a tax standpoint, may be received either in annual or other payments without altering in the least the need or the reasons for taxing such income or for withholding a part of it at its source. One advance payment to cover the entire 28-year period of a copyright comes within the reason and reach of the Revenue Acts as well as, or even better than, two or more partial payments of the same sum." (At 394.)

This same theory, and also in connection with literary copyrights, is followed in *Sabatini* v. *Commissioner*, 98 F.2d 753, 755 (C.C.A.2, 1938), and *Rohmer* v. *Commissioner*, 153

F.2d 61, 63 (C.C.A.2, 1946), *cert. denied*, 328 U.S. 862
(1946). In the latter case, Judge Jerome Frank likened the
situation to interest paid for several years in a single lump
sum or to rent paid in advance. "The phrase, we hold, is
descriptive of the nature or type of income, regardless of
actual manner of payment." (At 63.)

In *Commissioner* v. *Raphael*, 133 F.2d 442 (C.C.A.9,
1943), it was held that interest awarded to the taxpayer as
part of a judgment and the interest on the judgment, both
of which were paid in a single lump sum, constituted a "de-
terminable annual or periodical gain." In *United States* v.
*Balanovski*, 131 F. Supp. 898 (D.C.N.Y. 1955), it was held
that the phrase "annual or periodical income" includes dis-
counts received by a foreign partnership for purchases made
in the United States, even though all the purchases were made
in a single year, intermittently and from different suppliers.[14]
See, also, *Ehrlich* v. *Higgins*, 52 F. Supp. 805, 807 (D.C.N.Y.
1943), and *Misbourne Pictures Limited* v. *Johnson*, 189 F.2d
774 (C.C.A.2, 1951).

In the case at bar, although the excise taxes were re-
funded in one sum, there is no question that the right thereto
arose periodically as payments were made under protest. The
running of the period of limitation commenced with each pay-
ment. (Act No. 8 of April 19, 1927, Sess. Laws, p. 124.)
This conclusion can not be altered by the facts that San
Juan Trading Co. decided to join its claims in one single
judicial proceeding, that the federal court, consequently, also
ordered in a single judgment the refund of all excise taxes,
and that the officers of the Government of Puerto Rico decided
to pay the same in one lump sum. The "nature and type of
income" could not be altered to suit the conveniences of the
judicial and administrative proceedings.

Having clarified this question, there can be no question

---

[14] On appeal—236 F.2d 298 (1956), *cert. denied*, 352 U.S. 968 (1957)—
it was held that the partnership "was engaged in business" in the United
States and was therefore subject to federal taxation.

that San Juan Trading Co. was bound by law to withhold the tax payable by The Diamond. Section 22(a), read together with § 35, imposed that duty on "all corporations and partnerships" having the "control, receipt, custody, disposal, or payment of . . . annual or periodical profits or income" of "foreign corporations and partnerships subject to taxation" of their income, "not engaged in industry or business within Puerto Rico and not having any office or place of business therein. . . ." Therefore, San Juan Trading Co. acted correctly in reporting those incomes in 1941 in its information return of tax withheld at the source, and in paying in 1945 the corresponding tax "withheld by this corporation from The Diamond Match Company." The question whether the domestic corporation has not, in fact, recovered from The Diamond the money thus paid should be settled by them in an action independent from the one herein and in the light of the applicable legal provisions.

The judgment appealed from will be affirmed.

Mr. Justice Santana Becerra did not participate herein.