INTER-AMERICAN ORANGE CRUSH CO., Plaintiff and Petitioner, *v.* SECRETARY OF THE TREASURY, Defendant and Respondent.

No. 11609. Submitted June 11, 1956.—Decided April 30, 1959.

*Manuel García Cabrera* and *Luis F. Cuyar* for petitioner. *Hiram R. Cancio, Secretary of Justice (José Trías Monge, former Secretary of Justice,* and *Arnaldo P. Cabrera, Assistant Attorney General,* in the brief) and *J. C. Santiago Matos, Assistant Attorney General,* for respondent.

MR. JUSTICE SALDAÑA delivered the opinion of the Court.

Plaintiff herein is a foreign corporation authorized to do business in Puerto Rico. During the years 1947 to 1949, inclusive, it sold to its licensees in Argentina, Venezuela and Cuba ingredients to manufacture the concentrates for certain carbonated drinks. The sale of such products was made in Puerto Rico, that is, the title to the merchandise was transmitted here. In accordance with the terms of several contracts entered into many years before between the plaintiff and its licensees, the latter were bound to pay a certain price

for the ingredients. But they also appeared as paying other sums for the use of or for the privilege of using in Argentina, Venezuela and Cuba the trademarks and the trade names belonging to the plaintiff. The question raised herein is whether the sums paid on account of the latter item were for rentals or royalties which should be treated as income derived from sources without Puerto Rico and should be excluded from plaintiff's gross income, or whether, on the contrary, such payments actually constituted part of the selling price of the ingredients, which ought to be treated as income derived from sources within Puerto Rico and should be included in the computation of the gross income.

 The Income Tax Act of 1924, which is applicable to the three years in question, provided that the following items of gross income of a foreign corporation authorized to do business in Puerto Rico shall be treated, among others, as income from sources *within Puerto Rico:* "Rentals or royalties from property located in Puerto Rico or from any interest in such property, including rentals or royalties for the use of or for the privilege of using in Puerto Rico, patents, copyrights, secret processes and formulas, good will, trademarks, trade brands, franchises and other like property; *Provided,* That the sums received from the Federal Agricultural Adjustment Administration or from any other agency of the Federal Government, or the Government of Puerto Rico, for benefit payments or for compensation for quota reduction in agricultural production, shall be included in the term 'gross income.'" Section 19(a), Session Laws, 1925, pp. 400, 448–50; 13 L.P.R.A. § 698(a). Conversely, the following items, among others, were excluded from the gross income of a foreign corporation authorized to do business in Puerto Rico, as income from sources *without Puerto Rico:* "Rentals or royalties from property including rentals or royalties for the use of or for the privilege of using without Puerto Rico, patents, copyrights, secret processes and

formulas, good will, trademarks, trade brands, franchises and other like property." Section 19 (c), Session Laws, 1925, pp. 400, 450–52; 13 L.P.R.A. § 698 (c).

Although these definitions of what constituted "gross income" appear in § 19, which applies to the case of a "nonresident individual not a citizen of Puerto Rico," § 31 (b) of the Act provides specifically that: "In the case of a foreign corporation, gross income means only gross income from sources within Puerto Rico, determined (except in the case of insurance companies subject to the tax imposed by sections 41 or 44) in the manner provided in section 19." Session Laws, 1925, pp. 400, 476; 13 L.P.R.A. § 734 (b). Likewise, according to § 32 (b) of the Act: "In the case of a foreign corporation the deductions allowed in subdivision (a) [for computing the net income] shall be allowed only if and to the extent that they are connected with income from sources within Puerto Rico; and the proper apportionment and allocation of the deductions with respect to sources within and without Puerto Rico shall be determined as provided in section 19 under rules and regulations prescribed by the Treasurer [Secretary of the Treasury]." Session Laws, 1925, pp. 400, 482; 13 L.P.R.A. § 735 (b). Consequently, all the provisions contained in § 19 of the Act are applicable to a foreign corporation doing business in Puerto Rico, for the purpose of determining what items should be treated as income from sources without or within Puerto Rico and excluded or included in computing its "gross income." This is so recognized by art. 200 of Regulation No. 1 of the Department of the Treasury, which expressly states that: "The procedure governing the allocation of the income of nonresident individuals not citizens of Puerto Rico is made applicable to foreign corporations by sections 31 (b) and 32 (b) of the Law."

On the other hand, there is no question that under par. (e) of the said § 19 of the Act the income of a foreign cor-

poration derived from the sale of tangible personal property should be allocated, as derived from sources within or without Puerto Rico, in accordance with the allocation procedure provided by art. 200 of Regulation No. 1 of the Department of the Treasury. *Cf. San Juan Trading Co., Inc.* v. *Secretary of the Treasury*, 80 P.R.R. 778 (1958). In fact, the income derived from the sale of tangible personal property is not expressly included in the gross income as "income from sources within Puerto Rico," according to par. (*a*) of § 19, nor is it expressly excluded from the gross income as "income from sources without Puerto Rico," according to par. (*c*) of § 19.[1] Hence, in the case involving income derived from the sale of personal property, we must abide by the pro-

---

[1] It is to be noted that the Spanish text of par. (*a*) (5) of § 19 reads as follows: "*Ganancias, beneficios, e ingresos derivados de la venta de propiedad* inmueble *radicada en Puerto Rico*." (Roman ours.) Session Laws, 1925, pp. 400, 450. The English text of the Act coincides: "Gains, profits, and income from the sale of *real property* located in Puerto Rico." *Id.* However, through a printer's error, said par. (*a*) (5) of § 19 says exactly the opposite in the Spanish text of. Laws of Puerto Rico Annotated: "*Ganancias, beneficios, e ingresos derivados de la venta de propiedad* mueble *radicada en Puerto Rico*." (Roman ours.) And par. (*c*) (5) of § 19 of the Spanish text also speaks of "*Ganancias, beneficios, e ingresos derivados de la venta de* propiedad *radicada fuera de Puerto Rico*," as one of the items of gross income which shall be treated as derived from sources without Puerto Rico. But it should be understood that it applies only to the sale of *real property* located without Puerto Rico. In fact, the English text of § 19(*c*) (5) reads as follows: "Gains, profits, and income from the sale of *real property* located without Puerto Rico." It is not an error in the English text of the Act, inasmuch as § 217(*c*) (5) of the Revenue Act of 1921, after which our Income Tax Act of 1924 was patterned, referred to "sale of *real property* located without the United States." See Barton, *Federal Income and Estate Tax Laws*, 120–28 (2d ed. 1925). The federal act of 1921 differentiated the treatment between income derived from the manufacture and sale and income derived from mere operations of purchase and sale. It provided that: "Gains, profits and income derived from the purchase of personal property within and its sale without the United States or from the purchase of personal property without and its sale within the United States, shall be treated as derived entirely from the country in which sold." But, this provision was not incorporated in our Income Tax Act of 1924. *Cf.* §§ 119, 211, 212, and 231 of our new Income Tax Act of 1954, 13 L.P.R.A. Supp. §§ 3119, 3211, 3212, and 3231, and the provisions in the recent Regulations of that Act (1958), pp. 494–510, 765–75, 783–86.

visions of par. (e) of § 19: "Items of gross income, expenses, losses and deductions, other than those specified in subdivisions (a) and (c), shall be allocated or apportioned to sources within or without Puerto Rico under regulations prescribed by the Secretary of the Treasury. Where items of gross income are separately allocated to sources within Puerto Rico, there shall be deducted (for the purpose of computing the net income therefrom) the expenses, losses and other deductions properly apportioned or allocated thereto and a ratable part of other expenses, losses or other deductions which cannot specifically be allocated to some item or class of gross income. The remainder, if any, shall be included in full as net income from sources within Puerto Rico." Session Laws, 1925, pp. 400. 452; 13 L.P.R.A. § 698(e). That is why art. 200 of Regulation No. 1 clearly prescribed: "When income is derived from the manufacture or sale of tangible personal property, the portion thereof attributable to sources within Puerto Rico shall be taken to be such percentage of the total of such income as the tangible property and business within Puerto Rico bear to the total tangible property and total business, the percentages of tangible property and of business being separately determined as hereinafter provided and the two percentages averaged." [2]

However, the burden is always on the taxpayer to prove what portion of the income derived from the sale of personal property should be allocated to sources without Puerto Rico. If the evidence does not furnish any basis for apportioning or allocating the gross income, the totality of such income

---

[2] In art. 200 the following is added: "With the exception of a few items, such as certain interest, partnership profits, dividends, compensation for labor or personal services, rentals and royalties, gains from the sale of real property and transportation receipts, the law states no definite rule as to what shall be treated as income from sources within Puerto Rico. Net income from business in general is to be allocated or apportioned to sources within or without Puerto Rico under regulations prescribed by the Treasurer."

shall be treated as "income from sources within Puerto Rico." See *Wodehouse* v. *Comm'r*, 177 F.2d 881 (2d Cir. 1949), and *Misbourne Pictures Ltd.* v. *Johnson*, 189 F.2d 774 (2d Cir. 1951). In this case the plaintiff did not introduce, either before the Secretary of the Treasury or before the Superior Court, any evidence which would permit it to invoke the method of allocation prescribed by art. 200 of Regulation No. 1. Moreover, the taxpayer herein takes it for granted that if all the payments made by its licenses were derived from the selling price of the ingredients, it would be necessary to include them in its gross income as derived from sources within Puerto Rico.

■ The operations transacted by plaintiff with its licensees in Argentina, Venezuela and Cuba were governed by three different contracts which were executed in 1927, 1938, and 1945, respectively. However, it was agreed in all of them, briefly, that the licensee would have the exclusive right to manufacture, with the ingredients supplied by plaintiff, the concentrates for certain carbonated drinks and to sell such concentrates in the territory of each country under the trademarks and traded names belonging to the plaintiff. Each licensee was bound to manufacture the concentrates exclusively with the ingredients sold to it by the plaintiff, following certain "secret formulas" which also belonged to the latter. It was also agreed that every licensee would pay to the plaintiff: (1) certain fixed prices for every unit of ingredients, and also (2) royalties for the use of the trademarks and the trade names under which the concentrates and the carbonated drinks were sold in the market. Those royalties were computed at a fixed price for each gallon of concentrates which the licensee would manufacture with the ingredients sold by the plaintiff. It was agreed that plaintiff would bill the licensees for the royalties with each shipment of ingredients, that each invoice would determine the number of gallons of concentrates on the basis of production per unit

of ingredients, according to plaintiff's formula, and that the licensee would pay such invoices within a period of 90 days (in the case of Argentina) and of 60 days (in the cases of Venezuela and Cuba), to be counted from the date of each shipment. The terms of duration of the contracts between plaintiff and its licensees are as follows: 99 years with Argentina, 75 years with Venezuela, and 49 years with Cuba.

Those contracts were originally executed in favor of Orange Crush Co., but on February 5, 1946 they were assigned by the latter to a subsidiary sales company, the Inter-American Orange Crush Co. It was the latter corporation which carried out, as assignee of the contracts and owner of the trademarks and trade names under which the concentrates and the carbonated drinks are offered in the market, all the operations with the licensees of Argentina, Venezuela and Cuba during the years 1947 to 1949, inclusive.

Since early in 1946, the plaintiff Inter-American Orange Crush Co., which has always qualified as a "western hemisphere trade corporation" under the provisions of the Federal Internal Revenue Code, started to do business in Puerto Rico with the authorization of the then Executive Secretary of Puerto Rico.[3] It was so stipulated by the parties in this litigation. Plaintiff's business with its licensees in Argentina, Venezuela, and Cuba was carried out as follows: (1) The Puerto Rico office received the orders from the licensees and transmitted them to plaintiff's head office in

---

[3] According to the federal act, the term "western hemisphere trade corporation" means a domestic corporation which meets the following requirements: (a) all of its business is done within the geographical limits of North, Central, and South America, or in the Antilles (other than incidental purchases); (b) 95 per cent or more of its gross income for the 3-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) is derived from sources without the United States; and (c) 90 per cent or more of its gross income for such period or such part thereof is derived from the active conduct of a trade or business. See 8 Mertens, *Federal Income Taxation*, § 45.76 (Zimet rev. ed.); Rudick and Allan, *Tax Aspects of Operations Under the Puerto Rican Exemption Program*, 7 Tax L. Rev. 403 (1952); Silverson, *Corporations in Foreign Trade and*

Chicago. (2) The head office made the shipments, exporting directly from the United States the ingredients without passing through Puerto Rico. (3) In accordance with the bills of lading and the invoices, in the sales of merchandise thus exported, title to the ingredients was transferred to the licensees in Puerto Rico. (4) The head office prepared three invoices for every shipment of ingredients: one which appeared as issued in Chicago charging the price for the ingredients which the Orange Crush (manufacturing company) had charged to plaintiff in Puerto Rico; another which appeared to be issued in San Juan charging the licensee with the selling price of the ingredients stipulated in the contracts; and a third one which appeared also to be issued in San Juan charging the licensee with the royalties for the gallons of concentrates to be manufactured with the ingredients, in accordance with plaintiff's formula. (5) Those three invoices and the corresponding bill of lading for each shipment of ingredients were sent to plaintiff's office in San Juan. (6) The fiscal agent in charge of the San Juan office drew a draft which he sent to a bank in Puerto Rico, together with the bills of lading, in order that the latter as collector would receive the amount due by the licensee in Argentina, Venezuela or Cuba, and then deliver the money received to plaintiff's office in San Juan. Of course, these collections included both the amount of the invoice covering the selling price of the ingredients and the amount of the invoice by

*Income Taxes*, N. Y. U. Fourth Ann. Inst. on Fed. Taxation, 647 (1946); Seghers, *How Americans Can Best Do Business Abroad and Foreigners Best Do Business Here*, N. Y. U. Sixth Ann. Inst. on Fed. Taxation, 926 (1948); Baker & Meek, *Tax Problems of Doing Business Abroad: Some Practical Considerations*, 1957 Wis. L. Rev. 73; and Dean, *The Current Importance of Western Hemisphere Trade Corporations*, N. Y. U. Tenth Ann. Inst. on Federal Taxation, 489 (1952). It has been held that Puerto Rico is a country of the Western Hemisphere for the purposes of § 921 of the Federal Internal Revenue Code of 1954, which prescribes the requirements for qualifying as a "western hemisphere trade corporation," and which corresponds to § 109 of the Federal Code of 1939. See IT 3748, CB 1945, p. 152.

way of royalties charged to the licensee. (7) The money received in San Juan was finally sent to plaintiff's head office in Chicago.[3a]

During the years in controversy plaintiff's licensees were engaged, pursuant to the afore-mentioned contracts and the evidence presented, in the preparation or manufacture of the concentrates with the ingredients which Inter-American Orange Crush Co. sold to them. They then sold in the territory of each country the concentrates which made up the carbonated drinks. Apparently, the licensees also carried out the operation of bottling the concentrates. In any event, the licensees sold the concentrates for carbonated drinks in their respective markets under the trademarks and trade names belonging to Inter-American Orange Crush Co. Owing to restrictions imposed by the government of Argentina on the exportation of dollars, plaintiff was compelled to discontinue the sale of ingredients to its licensee in the Argentine Republic since May 1948. The original contract was then amended, eliminating the clause which provided: "The licensee agrees to manufacture the concentrates exclusively with the ingredients to be supplied by the company." The Argentine licensee continued to manufacture, with the ingredients purchased by it in that country, the concentrates for carbonated drinks and to sell them under the trademarks and trade names belonging to the plaintiff. However, after May 1948 the Argentine licensee continued to pay to the plaintiff the royalties agreed upon in the original contract.

During the years 1947, 1948, and 1949, plaintiff also did business in the Dominican Republic, the Bahama Islands,

---

[3a] The following should be noted: both parties admitted that the title to the ingredients sold to the licensees was transmitted in Puerto Rico. Thus, this case does not raise any problem regarding the place where passage of the title occurred. *Cf. United States* v. *Balanovski*, 236 F.2d 298, 305–07 (2d Cir. 1956); note in 69 Harv. L. Rev. 567; Wender, *Doing Business Abroad in Corporate Form*, Ninth Tax Institute U. of So. Cal. 139 (1957); and 8 Mertens, *Federal Income Taxation* §§ 45.38 and 45.39 (Zimet rev. ed.).

and the Virgin Islands. But in these countries it did not sell the ingredients but the concentrates for the carbonated drinks, ready for bottling. And in the sales which it made in the Dominican Republic, the Bahama Islands, and the Virgin Islands the plaintiff did not collect any royalties for the use of its trademarks. It only received the selling price of the concentrates for the carbonated drinks. In the sales registers and accounting books of the plaintiff for the years in question, the income received by way of royalties and the income received by way of selling price of the ingredients were not broken down in separate entries. Moreover, in its first income tax return for the year 1946, the plaintiff included in its gross income all the payments received from Argentina, Venezuela, and Cuba, without excluding as income from sources without Puerto Rico the amount received for royalties pursuant to the afore-mentioned contracts. The parties stipulated that, "in connection with many of the sales of ingredients made by plaintiff to its licensees during the years covered by these proceedings, the corresponding entries and invoices show that those sales were made at a price lower than that paid by or charged to said plaintiff for the same ingredients." According to the uncontroverted testimony of Mr. Domenech, fiscal agent for the plaintiff in Puerto Rico, this was due "to the fact that it was very difficult to obtain through normal channels the raw material for the ingredients, and it being the company's desire not to overburden the licensees, they elected to absorb that loss item." And, as correctly stated by the trial judge at the hearing, the evidence showed that "apparently [it] was not always [the situation], it was true in some instances and in those instances in which the company preferred to absorb the difference."

After analyzing these facts, the trial court held that *everythng* plaintiff received from its licensees in Argentina, Venezuela, and Cuba was part of the sellig price of the

ingredients, with the exception of the amount paid by the Argentine licensee as of May 1948, when the sales of ingredients for the manufacture of concentrates in that country ceased completely. In other words, it ruled that, as a matter of law, plaintiff never received any payments by way of royalties from those licensees, except for the period between May 1948 and December 31, 1949. True, the sums paid by the Argentine licensee during the latter period were treated as royalties. Consequently, it rendered judgment "dismissing the complaint as respects the items of income derived from [Argentina] Cuba and Venezuela in the years 1947, 1948, and 1949, but sustained the same as respects the items of income from royalties [derived from Argentina] as of May 1948, after which no ingredients were sold . . . in that country." We believe that, pursuant to the provisions of §§ 19 and 31 of the applicable law, that judgment is erroneous and should be reversed. Considering all the facts proved, it is obvious that the sums paid to plaintiff for the use of or for the privilege of using its trademarks and trade names in foreign markets, constituted true and unquestionable royalties which should be treated as income from sources without Puerto Rico and excluded from its gross income.

The terms "sources without or within Puerto Rico" employed in §§ 19 and 31 of the Act refer strictly to the *origin* of the income. The income is allocable to the situs where the activities are carried on, or where the properties which produce gains and profits are used or located. And, in the case of a foreign corporation, the income is not taxable if the properties from which it is derived are used or are located without Puerto Rico. The underlying theory of this rule is that the consideration for taxation is the protection, opportunities, and advantages afforded by the State to the properties and activities which produce gains, profits, and other income. See *P. R. Telephone Co.* v. *Sec. of the Treas.*, 79 P.R.R. 845 (1957) and 8 Mertens, *op. cit. supra* § 45.27.

Regarding royalties, the Act of 1924, as noted above, expressly provides that the "source" of such income depends on the situs where the personal property from which the income is derived is really and actually used. If the use takes place in Puerto Rico, the royalties are attributable to "sources within Puerto Rico." Yet, if the personal property is used in a foreign country, the gains and profits received are treated as income from "sources without Puerto Rico." The trademarks and the trade names under which the products are offered in the market are specifically mentioned in the Act as personal property which may produce income within or without Puerto Rico, depending on the situs where they are used by a foreign corporation authorized to do business in our country. Neither the place where the contract is executed for the payment of the royalties nor the place where the taxpayer received the income determines its "source" or origin. The rule is clear: royalties paid for the use of or privilege of using copyrights, trademarks, trade names, etc. have their "source" in the country where the literary works or the products the object of such personal property rights are sold. That is where the latter produce gains and profits. *Cf. Comm'r* v. *Wodehouse*, 337 U.S. 369 (1949); *Bloch* v. *United States*, 200 F.2d 63 (2d Cir. 1952); *Misbourne Pictures Ltd.* v. *Johnson*, 189 F.2d 774 (2d Cir. 1951); *Rohmer* v. *Comm'r*, 153 F.2d 61 (2d Cir. 1946); *Sabatini* v. *Comm'r*, 98 F.2d 753 (2d Cir. 1938); Allen & Coggan, *Aliens and the Federal Income Tax*, 7 Tax L. Rev. 253 (1950); 8 Mertens, *op. cit. supra*, § § 45.27–.36; *Source of Income as Within or Without the United States Under the I.R.C.*, 160 A.L.R. 559 (1946); 3 P-H Federal Taxes (1959), § § 16,295C–16,389.

Naturally, in its contracts with the licensees of Argentina, Venezuela, and Cuba plaintiff could have included in the selling price of the ingredients a sum equivalent to the total amount of the royalties, and thus grant gratuitously the use of its trademarks and trade names under which the

concentrates were sold in the market.[4] But it is an undeniable fact that that was not the agreement with any of the licensees in those countries. On the contrary, they specifically fixed separately and apart (1) a fixed selling price for the ingredients and (2) certain rentals or "royalties" for the use of the trademarks and trade names owned by Inter-American Orange Crush Co. The fact is that those trademarks and trade names had a substantial value for offering and selling in the market the concentrates for carbonated drinks. There is no question that the licensees actually used those trademarks for offering the concentrates in the market. And all the transactions between Inter-American Orange Crush Co. and its licensees reflect the actual and effective existence of the "royalties." Thus, for example: after the sales of the ingredients to the Argentine licensee ceased altogether, the latter continued to pay to the plaintiff exactly the same "royalties" for the use of the trademarks. It only discontinued the payment of the price agreed upon for the ingredients because, instead of purchasing them from the plaintiff, it purchased them locally in Argentina. It is therefore impossible to classify the *royalties* paid as *"part of the selling price of the ingredients."*

---

[4] This is precisely what Inter-American Orange Crush Co. did when exporting the *concentrates* (not the ingredients) to other foreign markets: to the Dominican Republic, the Bahama Islands, and the Virgin Islands. In *Sánchez v. Comm'r*, 162 F.2d 58 (2d Cir. 1947), instead of accepting the payment of royalties for the use of a certain patent in foreign markets, the inventor gave to a certain domestic corporation an exclusive grant in exchange for a certain percentage of the sales of the products the object of the patent within and without the United States. Separate accounting books were kept for the sale of the products in the United States and the sale of products without the United States. However, the circuit court held that all income received by the owner of the patent was derived from sources within the United States, pointing out that: "Anything which might have been received by it by way of royalties . . . for the use of the petitioner's foreign patents [abroad] was renounced when purchasers were allowed, presumably as part of the inducement to buy at the sales price charged, to use those patents for nothing. And so the petitioner received . . . nothing for the use of any foreign property." (At. 59.)

In view of these indubitable facts, the method stipulated for computing or estimating the "royalties" is unimportant. These were calculated, as we have pointed out, on the basis of a fixed price per gallon of concentrates which the licensee could manufacture with the ingredients sold. The plaintiff issued invoices for the "royalties" with every shipment of ingredients, for it was easy to determine the number of gallons of concentrates which each unit of ingredients would produce. The licensee paid the invoices for the "royalties" within a period of 90 days (in the case of Argentina) and within 60 days (in the cases of Venezuela and Cuba), counted as of the date of each shipment. The Superior Court concluded that this method of payment of the rentals converted them into part of the selling price of the ingredients because it was not required, before collecting the "royalties", that the trademarks and the trade names be actually used by the licensees. In our opinion, this conclusion of the trial court is erroneous. The term "rentals for the use of or for the privilege of using without Puerto Rico trade marks or trade names under which the products are offered in the market" refers to or describes the class or nature of the income and not the method of the payment. See *Sabatini* v. *Comm'r*, 98 F.2d 753, 755 (2d Cir. 1938), and *Rohmer* v. *Comm'r*, 153 F.2d 61, 63 (2d Cir. 1946). Even though the "royalties" were paid in advance and the amount thereof measured by the number of units of ingredients sold in Puerto Rico, there is no question that they constituted income derived from the use of the personal property in foreign markets. This character of the income is what determines its "source." *Cf. Comm'r* v. *Piedras Negras Broadcasting Co.*, 127 F2d 260 (5th Cir. 1942) and *British Timken Ltd.*, 12 T.C. 880 (1949). Aside from this, the method for computing the payments of rentals in this case depended, in the last analysis, on the sales of concentrates for carbonated drinks made by the licensees in Argentina, Venezuela, and Cuba under the trademarks and trade names owned by plaintiff. *Cf. Comm'r*

v. *Wodehouse,* 337 U.S. 369 (1949), and 8 Mertens, *op. cit. supra,* §§ 45.27–45.36.

■ The Secretary of the Treasury emphasizes two facts: (1) that in the sales registers and accounting books of the plaintiff the income received by way of "royalties" and the income received by way of selling price of the ingredients were not broken down into separate entries; and (2) that in its 1946 return the plaintiff included in its gross income all the payments received from Argentina, Venezuela, and Cuba, without excluding as income from sources without Puerto Rico what it had received by way of "royalties." Needless to say that the determination of the taxable income "rests on actual facts and not on theories, technicalities, or bookkeeping entries." *Loíza Sugar Co.* v. *Domenech,* 44 P.R.R. 536, 541 (1933) ; *D. Velasco & Co.* v. *Sancho, Treas.,* 51 P.R.R. 54, 56 (1937) ; *Fernández* v. *Domenech, Treas.,* 53 P.R.R. 762, 768 (1938) ; and *Buscaglia, Treas.* v. *Tax Court,* 67 P.R.R. 61, 64 (1947). We cannot determine plaintiff's gross income on the basis of errors committed in the manner of keeping its sales registers and accounting books. They constitute evidence, but they are not indispensable or conclusive in favor or against the taxpayer or the Secretary of the Treasury. See *Helvering* v. *Midland Mut. Life Ins. Co.,* 300 U.S. 216 (1937) ; *Doyle* v. *Mitchell Bros. Co.,* 247 U.S. 179 (1918) ; *Comm'r* v. *Union Pacific R. Co.,* 86 F.2d 637 (2d Cir. 1936) ; *Wassel* v. *United States,* 49 F.2d 137 (8th Cir. 1931) ; and 1 Mertens, *op. cit. supra,* § 5.09. An identical rule applies to the taxpayer's 1946 return. Therefore, it is sufficient to point out the following: in this case it was proved to satiety that the entries in the accounting books and the 1946 income tax return of Inter-American Orange Crush Co. do not reflect the true facts nor the true nature of the transactions with its licensees in Argentina, Venezuela, and Cuba. Nor is it important that the plaintiff in many instances sold the ingredients to its licensees at a price which resulted in a loss to it. There is

no basis in the evidence to conclude that the plaintiff attempted in this fashion to evade the payment of taxes in Puerto Rico. On the contrary, in our opinion the circumstances which led to these losses were fully explained by plaintiff. Apparently that was also the opinion of the trial judge, pursuant to the record before us, although in his judgment he made no pronouncement on this point.

The judgment on review will therefore be reversed and another entered instead sustaining the complaint in this case and, consequently, setting aside the deficiencies notified by the Secretary of the Treasury to Inter-American Orange Crush Co. in the income tax returns of said corporation for the years 1947, 1948, and 1949.

